# Paschall *versus* Passmore.

A, being the owner of land on both sides of a considerable stream, called Cobb's Creek, upon which was erected a small mill, fed by a short race, conveyed to B and C, in fee, a portion of the said land and the race, with the privilege of digging, through the other land of the grantor, a new and larger race, intended to supply a new mill or mills to be erected by the grantees, together with strips or parallel pieces of land on each side of the said intended race, for the convenience of the grantees, their heirs and assigns, in cleaning and maintaining the said race, and also the sole, absolute, and exclusive right to take and divert the water flowing or that might thereafter flow in the said creek into the race or races, dug or to be dug, and to have, use, and divert the water of the creek for the use and service of any mills or water-works which the grantees or their assigns should or might erect on the land granted, *or for any other use, service, or purpose whatsoever ;* saving and excepting, that the said grantees, their heirs and assigns,. should leave in the side of the race to be dug and used as aforesaid, a place to pass off so much of the waste water as they *in their discretion may think proper*, for the use of the grantor, his heirs and assigns ; under this condition, nevertheless, that the grantee, &c., *in consideration thereof*, do, at his and their own cost, erect and always keep in repair a sufficient bridge over the place where the waste water shall run, so that the grantees, &c. may at all times commodiously pass and repass over the same with horses and wagons, workmen, tools, &c. for all and every use and purpose whatsoever.　By a subsequent agreement, in writing, the parties agreed to change the site of the projected race, for the convenience of the grantor, he undertaking to erect and secure the banks made necessary by the alteration ; and, by a yet further agreement, it was provided that the original grantees

[Paschall *v.* Passmore.]

would convey to the grantor the right to enclose the ground through which the race was dug, subject to the grantees' right of ingress and regress for *the necessary and needful purpose of supporting and maintaining the race;* and should further grant to the grantor, his heirs and assigns, the right of pasturage and all the timber growing on the said strips of ground contiguous to the race.

It was *held;*

1. That though the grantees were, under the conveyance, entitled to the plenary use of the whole body of the stream, for any and every useful purpose to which it is applicable, and in the exercise of the discretion vested in them, much must be conceded to their judgment, yet this does not authorize them maliciously, wantonly, and unnecessarily to throw away the unused water of the stream, for the mere purpose of depriving the grantor or his assigns of the use of it.

2. The grantor, after his said conveyance, having built a mill, which, for a series of years, was driven by the waste water escaping through the waste weir, or over the defendant's dam, his alienees were entitled to recover damages against the alienees of the original grantees, for a *wanton and malicious* diversion of the waste water to the injury of the plaintiff's mill; but in such action the *onus* of showing a wanton and malicious diversion lay on the plaintiff.

3. Even conceding the erection and maintenance of a bridge over the waste weir to have been the sole consideration moving the grantees to agree to the reservation of the waste water by the grantor, a failure to build the bridge will not defeat the interest reserved.

4. But the construction of the bridge is not to be regarded as the sole consideration for the concession. The case is the ordinary one of a grant by general description, with a reservation or exception of a portion of the subject of it. The words "in consideration thereof" at most import that the undertaking to build the bridge was induced by the reservation of the use of part of the water, not that the reservation was purchased by the agreement to build.

5. Conditions in defeasance of an estate granted are odious, and hence, when the language of an agreement can be resolved into a covenant merely, the judicial inclination is so to construe it. Where a party has another remedy, a condition of forfeiture should not be declared, except the tribunal be compelled to it by rigid and unbending rule authoritatively settled.

6. As proper to frame a condition, certain words are recognised as, generally, of innate efficiency, among which are *"proviso" "ita quod"* and *"sub conditione."* But these conditional words sometimes serve but to work a qualification or limitation, and sometimes to make a covenant only, according to the intention of the parties and the manner in which they are used. If the clause in which they occur be the language of the feoffee or grantee, to compel the feoffor or grantor to do something, they make not a condition, but a covenant.

7. As the words, as used here, are the language of the grantor, and compulsory, not on the grantee, but on the grantor himself, in respect of an interest not derived from the grantee, but reserved by the grantor, and to which no forfeiture is specifically attached, the undertaking to build a bridge cannot be regarded as a condition; nor is it a qualification of the grantee's covenant, since that was to be performed before any thing done on the part of the grantor.

8. To make a technical condition, the words must be applicable to the thing granted, and not to some other thing; and as, in the present instance, the words relied on as conditional refer not to the estate granted, but to something which never was granted, they do not make a condition.

9. The grantor's undertaking to build a bridge, amounts but to a covenant, which goes only to a part of the consideration, and its failure may be compensated in damages; such failure cannot, therefore, justify a stoppage of the waste weir, or other diversion of the waste water.

10. *Quære,* whether the subsequent agreement shifting the location of the race, and giving to the grantor the right of shutting up, for pasturage, the land through which it runs, which rendered useless, if not impracticable, the cart-

[Paschall *v.* Passmore.]

way originally contemplated, does not amount to a waiver or release of the undertaking to build a bridge for horses and vehicles, especially as the parties, for more than a quarter of a century, had uncomplainingly acquiesced in the substitution of a small foot-bridge maintained at the weir, by the grantor and his alienees ?

THIS case came up from the Court of Nisi Prius, *Philadelphia.*

It was an action on the case, brought by John Paschall *vs.* Levis Passmore, for wantonly and maliciously wasting the waters of Cobb's Creek, a portion of which the plaintiff claimed, and for diverting the same from the mill of the plaintiff. The rights of the parties depended on a deed of December 5, 1801, from Henry Paschall, the father of plaintiff, to Robinson & Abbott, and on the two agreements hereinafter mentioned. Plaintiff derived title from his father, and Passmore claimed from Robinson & Abbott.

The deed of December 5, 1801, of Henry Paschall, to Robinson & Abbott, was for a tract of land, situate in the township of Kingsessing, in the county of Philadelphia, beginning by the side of Cobb's Creek, and, after pursuing several courses and distances extending to Cobb's Creek, then along and down the said creek by the several courses thereof, and bounding thereon fifty-eight perches and five-tenths of a perch to the place of beginning. Together with a log dwelling-house thereon erected, and with all and singular the buildings, improvements, fences, trees, orchards, mill-seats and conveniences for the same, shores, landings, creeks, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging or in any wise appertaining. Also, the free use and privilege of all roads and passages leading to the premises. Also, the mill-dam and pond now erected and built in and upon Cobb's Creek aforesaid, northward of the said Henry Paschall's present dwelling-house, and the sole and absolute right of the said dam and pond and of the soil which the said dam and pond now do or may cover. Also full and absolute right to have, hold, keep, and maintain the said dam in and over the said creek at its present height, and to raise and swell the water in the said dam and creek as high as the said James Robinson, Jr., and Henry Abbott, their heirs and assigns, shall or may at any time or times want for the use and service of any mill or mills or any other water-works which they may erect or build upon the above described tract or parcel of land hereby granted, without any interruption, suit, trouble, hinderance, or denial whatsoever. Also, the absolute right of soil to at least fifteen feet in extent all round the mill dam and pond aforesaid, from the outer edges thereof in all the different directions, and especially the absolute right of soil to both sides of Cobb's Creek aforesaid, as far as the mill dam and pond extend, and to the further distance of fifteen feet from the outer edges thereof, in all the different directions wherever the said Henry Paschall's lands and rights now are or shall be found ad-

[Paschall *v.* Passmore.]

joining the said dam and pond. Also the race already dug, and the absolute right of the soil over which that race doth now go. Also the absolute right of soil for a race to be dug by the said James Robinson, Jr., and Henry Abbott, 'their heirs and assigns, to be at least ten feet wide at the bottom and a suitable proportionate width at the top, and to be carried from the said mill dam and pond, through all the extent of the said Henry Paschall's land, and over and upon his garden and orchards, and the different ways and roads, and upon such ground, courses, and directions as the said James Robinson, Jr., and Henry Abbott, their heirs and assigns, shall in their discretion and judgment think will best suit their convenience and accommodation, and to carry the same to and upon the above-described tract of land hereby granted. Also, full and absolute right to enter and dig the said race in and upon the land of the said Henry Paschall, and to carry the same through all the extent of the said Henry Paschall's land, and over and upon the different ways in manner aforesaid. Also the absolute right of the soil over which the said race so to be dug shall go. Also, the absolute right of soil on both sides of the race so to be dug as aforesaid, in manner following, that is to say, a strip of land of fifteen feet in breadth on the west side of the said race, bounding thereon, and a strip of land of six feet in breadth on the east side of the said race bounding thereon, &c. Also, full, free and uninterrupted right, liberty, and privilege to repair the said race from time to time, and to enter and dig and take stones and dirt on the land of the said Henry Paschall, and to use and employ the same *for the use and service* of the said race, and of repairing the same, so that in the digging and taking such stones and dirt, as little damage as possible be done to the property of the said Henry Paschall. Also the *sole, absolute and exclusive right* to take and divert the water flowing, or that may at any time hereafter flow in Cobb's Creek aforesaid, into the race or races aforesaid, dug and to be dug, and to have, take, use, divert, employ, apply, and appropriate the said water of the said creek, for the use and service of any mill or mills, or other water works which the said James Robinson, Jr., and Henry Abbott, their several and respective heirs and assigns, shall or may erect and build upon the above-described tract of land hereby granted, or for any other use, service or purpose whatever. * * * Saving and excepting also that the said James Robinson, Jr., and Henry Abbott, their heirs and assigns, shall leave in the west side of the race to be by them dug and used as aforesaid, a place to pass off as much of the waste water as *they in their discretion* may think proper in the valley northwardly of the said Henry Paschall's present dwelling-house, which waste water so to be let off at that place shall be for the use of the said Henry Paschall, his heirs and assigns, *under this condition nevertheless*, that the said *Henry Paschall, his heirs and assigns*, in consideration thereof, do at his

[Paschall *v.* Passmore.]

and their own costs erect, and always keep in repair *a sufficient bridge over the place where that waste water shall run*, so that the said James Robinson, Jr., and Henry Abbott, their several and respective heirs and assigns, shall and may at all times be enabled commodiously to pass and repass over the same with or without horses, cattle, and loaded or unloaded carts, wagons, carriages, and with workmen, tools and implements, *for all and every use and purpose whatsoever.*

An agreement was made, dated January 1802, between Henry Paschall and Robinson & Abbott, by which, for the convenience of Paschall, the site of the proposed race was changed to the westerly side of Paschall's house, and between it and the creek; and the ground covered by it, and on each side of it, was granted to Robinson & Abbott; in consideration of which alteration of the course of the race, it was agreed that "he, the said Paschall, his heirs, executors, administrators, shall and will, at his and their own proper costs and charges, erect, make, and finish in a workmanlike manner, such banks for the race as, by reason of the alteration in the course of the race, should be necessary well and sufficiently to secure the said race, as well upon the land of the said Paschall, as upon the land granted by the within deed to the said Robinson & Abbott."

Afterwards, viz. in January 1807, an agreement in writing was made between Robinson & Abbott of the one part, and Henry Paschall of the other part, by which, *inter alia*, it was agreed that the said James Robinson and Henry Abbott shall, within ten days, convey to the said Henry Paschall, his heirs and assigns, *the right to enclose and keep enclosed the ground through which a certain mill-race* extends through the lands of the said Henry Paschall, subject always to the uninterrupted ingress, egress, and regress of the said Robinson and Abbott, their heirs and assigns, as mentioned in their deed, *for the necessary and needful purposes of supporting and maintaining the said mill-race.* And shall further grant to the said Henry Paschall, his heirs and assigns, *the right of pasturage, and all the timber* growing on the strips of ground mentioned in the deed, contiguous to the said mill-race, and appurtenant to it; the said rights of fencing and pasturage to commence north of the road leading to Philadelphia and Darby. Witness our hands and seals, 7th day of January 1807.

The action was for wantonly and maliciously wasting the water at the waste gate on Passmore's property, so as to deprive Paschall of what would otherwise have flowed into Cobb's Creek, and have served to work Paschall's mill. It was alleged that this was done wantonly and maliciously, by opening the waste gate *below* Paschall's mills at nights and on Sundays, when Passmore's mills were not in operation, and also by chaining up a head gate *above* his mills, so as to permit the water of Cobb's Creek to run into a race running nearly parallel to the creek, and by banking up a waste weir

[Paschall *v.* Passmore.]

in that race, the object of which waste weir was to permit the waste water to run into Cobb's Creek, where, by means of Paschall's dam below the waste weir, it would have been carried to his mill; but the waste weir being closed, the water passed along the race, and was permitted to run into Cobb's Creek *below* Paschall's mill, which was higher up the stream than the factory of Passmore, the defendant.

The case was tried before BELL, J., at Nisi Prius, who charged, *inter alia*, that the discretion as to the waste water was *a reasonable discretion*, and that though the bridge provided for, to be maintained by the grantor, his heirs and assigns, over the place where the waste water shall run, was not maintained, yet, that being but *a part of the consideration* of the contract of the grantees, this neglect did not bar the heir or assignee of the grantor from maintaining an action for the wanton and malicious wasting of the water. And further, that if the uses made of the water were in any degree beneficial either for the purpose of turning his mill-wheels, cleansing his race, for the preservation of its banks, or other useful purposes, the private motive by which he may have been actuated, though one of hostility toward the plaintiff, cannot be laid hold of to support the action, if otherwise it be not well founded. On the other hand, the non-existence of water-works, in which Henry Paschall or his grantees had an interest, at the time of the execution of the deed of 1801, in no degree affects any right he might take under that deed. He had a right to contract in reference to the future; and subsequent events seem to show that such was his object.

Further matters in the charge of his Honor, on points proposed on the part of defendant, will appear in the exceptions.

The eleventh point proposed on the part of the defendant was, "If plaintiff had raised his dams so high as to back his water upon defendant's land below the breast of his dam, the defendant might, in his own defence, to diminish the encroachment, prevent the water from flowing over the waste weir, either by draining it through the waste gate or banking over the waste weir."

This is founded on that construction of the deed which gives to the defendant the right of soil in fifteen feet all round the breast and dam. If this construction be correct, and it be admitted the plaintiff drove back the water on to the breast of defendant's dam, whereby an injury is inflicted on him, yet I cannot agree this gives to the defendant a right to violate his covenant by refusing the use of the waste water, unless, indeed, the act of the plaintiff so operates as further to endanger the race or other works of the defendant, and thus to make it proper to draw off the water which might otherwise be permitted to run into the plaintiff's dam. In such case, by the very terms of the deed under which both parties claim, drawing off the water might be a legitimate use of it, for, I repeat,

[Paschall *v.* Passmore.]

the defendant has a right to run into the bed of the creek all the water flowing through the race, if necessary to its safety or the safety of the mills to which it is appurtenant.

You will thus perceive that, though many legal points have been discussed and presented for decision, the controversy, from the view I have taken of it, is reduced to a narrow point of inquiry: Has the defendant, in the sound and reasonable exercise of his discretion, used the water of the creek for any purpose useful to his property, or has he wantonly and unnecessarily, without any view to his own benefit, wilfully wasted the water, whereby the plaintiff has been deprived of a benefit he would otherwise have enjoyed ?

In settling this question, you must remember the contract upon which both parties stand gives to the defendant a large licence. The use of it may be destructive of the plaintiff's mills or one of them; but this furnishes no reason why it should be circumscribed within the chartered limits prescribed by the deed.

All that we can do is to prevent its abuse. But if such abuse has been practised, it is within your power to say so; for, in conclusion, I repeat, the deed of 1801 does not constitute the defendant sole judge and despotic arbiter of the way in which he shall use the flow of the stream.

Damages to be compensatory.

Verdict was rendered for plaintiff for $200 damages.

It was assigned for error :

1. That the judge did not charge as requested in the fourth place, to wit, that the deed of 1801 "granted the sole, absolute, and exclusive right to take the water of Cobb's Creek, that is, the whole stream, for the use and service of their mills, or for any use or service whatsoever."

2. That he did not charge, as requested in the fifth place, that the grantees of H. Paschall had the right to use the water of Cobb's Creek in any way they might think useful, whether for the service of the mills, cleansing the race, or for any other use they might think proper, without accountability to H. Paschall or his assigns.

3. That he did not charge, as requested in the seventh place, that the extent of the grant to use the water by defendant's mills or through the waste gate for any use or service whatsoever, is not diminished or lessened by the clause relating to the waste way above, since the defendant was bound to let pass only " as much of the waste water as he in his discretion might think proper."

4. That he did not charge, as requested, that the omission of Paschall or assigns to erect a bridge over the waste weir discharged the defendant from his obligation to maintain the waste weir.

5. That he did not charge, as requested, that the defendant might prevent the flow of the water over the waste weir or breast

[Paschall *v.* Passmore.]

of dam, so as to diminish its encroachment on himself by backing from plaintiff's dam unduly raised.

6. In refusing to charge, that as the covenant to leave the waste weir having been performed by said grantees, and no covenant afterwards to maintain it, the defendant was not bound to maintain it, while plaintiff neglected to perform his part of the covenant, (to erect the bridge.)

7. In not charging that the defendant's motives in letting the water run could not be inquired into, nor malice or unneighborly feeling be imputed to him in the use of the water, if he had the entire right thereto.

8. The general errors.

The case was argued by *Price* and *Mallery*, with whom was *Hanbest*, for Passmore.

*Waln*, for Paschall.

The opinion of the court was delivered May 17, 1851, by

BELL, J.—On the trial of this cause at Nisi Prius, the principal subject of discussion and deliberation, so far as the law of the case is involved, was of the proper construction of that portion of the conveyance of 1801, which granted to Robinson and Abbott the absolute and exclusive right to use the waters of Cobb's Creek for the service of their mills and other water-works, " or for any other use, service, or purpose whatsoever ;" and the saving clause, reserving to the grantor the user of so much of the waste water as the grantees might, *in their discretion*, suffer to escape through a waste-weir, to be by them constructed in the west side of the then contemplated race, since constructed. The action was for *wantonly* and *maliciously* depriving the plaintiff of this waste water, by means of a waste gate inserted at the foot of the race; and the question of fact referred to the jury was, whether there was proof of such wanton and malicious expenditure of the surplus water, to the injury of the plaintiff, and without any proposed benefit to the defendant ? Under the evidence given, the jury found this issue affirmatively. But the defendant contended, and prayed the court to instruct the jury, that as, by the terms of the grant, the grantees were vested with "the sole, absolute, and exclusive right to take and divert the water" flowing in Cobb's Creek, the discretion reposed in them in respect of the escape of surplus water was an absolute discretion, to be determined solely by themselves, irrespective of the opinions and conclusions of third persons, and, consequently, there was no room for the question of fact sought to be raised by the plaintiff. The court thought differently, and accordingly directed, that under a proper construction of the conveyance, though the grantees were entitled to the plenary use of the whole body of the water, for any and every useful purpose to

[Paschall *v.* Passmore.]

which it was applicable, and in the exercise of their discretion much must, necessarily, be left to them; yet this does not involve a capricious power, maliciously, wantonly, and unnecessarily to throw away the water of the stream, for the mere purpose of depriving the plaintiff of the use of the surplus; the discretion contemplated by the parties being a sound and reasonable one, to be exerted for the benefit of the grantees, and not solely to the detriment of the grantor and those claiming under him.

After enjoying the benefit of an extended discussion on this point, and much subsequent reflection, all the members of this court, who sat at the argument, agree that the instruction given was founded in a correct interpretation of the conveyance from Henry Paschall to Robinson & Abbott. In construing this instrument, we are entitled, not only to consult the language of the deed itself, but we may, with propriety, look to the circumstances which surrounded the transaction at the time of its inception, and the attendant considerations which, probably, influenced the parties. It is obvious, the grantees contemplated the erection of a mill or factory, of larger dimensions, and requiring a greater power to drive it, than before then had been known and used at that place. For this purpose, it might be necessary to secure the command of the whole of the stream, and this, doubtless, was a primary object of the purchasers. But before this the grantor and his predecessors had used the water for driving a mill of inferior capacity and as the whole power of the creek might not be necessary, at all times, to propel the works to be erected by the grantees, it naturally occurred that the surplus might be usefully employed by the grantor, on his remaining land bounded by the stream, in the propulsion of subordinate works, without interfering with the main design of the grantees. Keeping in view the respective objects of the contracting parties, shown not only by the facts which existed before the contract and at its inception, but manifested by their subsequent course in the erection of the several works now owned, respectively, by the plaintiff and defendant, we are, beyond question, furnished with a clue to the strong and explicit language used in the conveyance of the water-power, the reason of the reservation, and the subordinate character it is made to assume. The contemplated new works might require the whole force of the stream permanently, or, at least, occasionally, and hence the provision giving to the purchasers, in the most emphatic language, the right to appropriate the entire body of water whenever required for any useful purpose. Hence, the declaration that they might " take, use, employ, and appropriate the said water of the said creek for the use and service of any mill or mills, or other water-works, which the grantees may erect and build upon the above-described tract of land, or for any other use, service, or purpose whatsoever." Theirs was to be the first and dominant right. They were to possess it

without any countervailing power to subtract from the free and full exertion of it, in the prosecution of a useful purpose. But yet, surely the grantor intended to stipulate for the reservation of a useful interest in the water, for something of value, and of which he and his assigns could not be deprived, in the indulgence of mere whim, caprice, or unneighborly feeling. He saved and excepted from the generality of the grant the waste water, to escape at an opening to be left in the race for that special purpose, "which waste water, so to be let off at that place, shall be *for the use* of the said Henry Paschall, his heirs and assigns." That it was thought the use of this waste water might be beneficial is evident, not only from the language of the reservation, but also from the application to be made of it, and its actual appropriation, in after years, as the motive-power of a grist and saw mill. True, the *quantum* of waste water was subjected to the discretion of the grantees. They were to leave "a place" in the race, "to pass off as much waste water as they, in their *discretion*, may think proper." But it is impossible to persuade oneself that the discretion intended by the parties was an arbitrary one. The very term itself, standing alone and unsupported by circumstances, imports the exercise of judgment, wisdom, and skill, as contradistinguished from unthinking folly, heady violence, and rash injustice. When technically employed in legal instruments, its proper acceptation is inseparable from the idea of dispassionate conclusion, having due regard to the rights and interests of others. It would require a very unequivocal declaration to overcome this, the natural signification of the word; and I find none such in the implication sought to be derived from the price paid by the original grantees, or in the manifest intent to make their interests and aims paramount those of the grantor. The construction given at Nisi Prius might, therefore, be left to rest on the unassisted language of the instrument. But when we couple it with the undoubted object of the grantor, as evidenced by the subsequent erection of mills, dependent on the waste water, and propelled by it for nearly thirty years, it is impossible to believe that a sane man would, in set terms, contract for the escape of a portion of water sufficient for such a purpose, but of which he might be deprived, in a year or a day, by the caprice, or some worse feeling, not only of the grantees, but of every one who might succeed them as owners. It is unquestionably true, that in determining the due exercise of the discretion accorded to the owners of the lower mills, they are to be treated in a liberal spirit. To establish a violation of their discretion, it is always incumbent on the complainant to show, by clear proof, a wanton and useless waste of the water, without any intent of benefit to themselves; and so the jury was told. To go beyond this would, in our apprehension, be in gross violation of the spirit of the contract, and

[Paschall *v.* Passmore.]

utterly subversive of the design which suggested that part of it now under consideration.

A second question mooted at the trial, was as to the legal effect of the grantor's undertaking to erect and maintain a bridge "over the place where the waste water shall run." It was treated as altogether subordinate, and of minor importance to the inquiry just disposed of; and although, in one of the points submitted by the defendant, the obligation assumed was pointed to as a condition, in the next succeeding proposition it was treated as a dependent covenant, the non-performance of which might excuse the continued fulfilment of the grantee's covenant to maintain a waste weir in the side of the race. It was so considered in the discussions which had place during the progress of the investigation, and was so regarded by the court in the final instructions given to the jury. In this court, however, it is presented as a strictly technical condition subsequent, the non-performance of which operates, utterly to defeat the reserved interest of the grantor in the surplus water. It is submitted, that the mutual stipulations of the parties, in this particular, are not independent stipulations, to be sued by either party sustaining an injury, but are dependent, each upon the other; the omission of one releasing the other from all obligation.

This position is founded in the peculiar language employed to express the undertaking of the grantor, and, as it is insisted, the consideration to be paid for the reserved waste water. It is said, the saving of this water and the erection of the contemplated bridge were the only consideration, one of the other. Were this conceded, it by no means follows that a non-performance of the consideration would defeat the estate or interest reserved. It is true, that, in some cases, *pro* has the force of a condition, when the thing granted is executory, and the consideration of the grant is a service, or some other like thing, for which there is no remedy other than stopping the thing granted; as in the case of an annuity granted for counsel and advice thereafter to be furnished: 5 *Vin. Abr. H.* 2, pl. 12. So, if one grants a way over his land, and the grantee, *pro chimino illo habendo*, grants to the grantor a rent charge, a stoppage of the way is said to be a stoppage of the rent, *id.* pl. 5, under the ordinary principles which govern evictions and their consequences. But there is a great diversity between a conveyance of land, or the reservation of an absolute interest, in a corporeal thing, and the grant of an annuity, rent, or the like. For, if A, *pro una acra terræ*, makes a feoffment or lease of an acre, an eviction of the former will not give A the right to re-enter into the latter, without legal words of condition; for the failure of the consideration does not avoid the estate of the feoffee, or lessee. The reason given for this diversity is, that the estate in the land is executed, and the annuity, rent, or other thing is executory: *id.* pl. 9. So, here, the estate or interest in the sur-

[Paschall *v.* Passmore.]

plus water was executed, or rather it never was out of the grantor, being reserved by the same instrument that operated to convey the body of the stream to the defendant's predecessors. The case is not, therefore, one falling under the operation of the principle invoked, even upon the concession of mutuality of consideration. In truth, however, the construction of the bridge is not to be regarded as the sole consideration prompting the concession of the surplus water. It is not a grant by Robinson and Abbott to Paschall. For a certain sum to be paid, the latter granted to the former the use of the water of Cobb's Creek, at a particular point, but reserving, as that which already appertained to him, certain portions of that water. The thing belonged to him before, and continued to belong to him after, conveyance. It cannot, therefore, be said, either in fact or legal intendment, that any consideration passed from the grantee to the grantor, as the purchase of this reservation, simply because the former had it not to sell. Both before and after the sale, it was the property of Paschall. The deed conveyed it not, and there is, consequently, no room to say it was purchased at a price. The case presented is, then, the ordinary one of grant, by a general description, with a reservation of, or exception out of the grant of, a defined portion of the subject of it. The words, "in consideration thereof," found in this clause of the deed, at most import, that the undertaking to build the bridge was induced by the reservation of the use of a part of the water in a particular way, and the consequent inconvenience occasioned to the grantees; not that the reservation was purchased by the agreement to build.

We are, thus, reduced to the naked inquiry, whether the words, "under this condition nevertheless," of themselves create a condition destructive of the interest reserved, because of its non-performance? In view of the facts, that for more than twenty-four years, the waste weir was maintained in pursuance of the grantee's undertaking; that, during all that time, no complaint was made of the non-erection of the bridge, and no request preferred for its erection; that no possible injury was inflicted on the owners of the lower mills from its non-erection, and that the weir was at last stopped, not because the bridge was not built, but, avowedly, for the reason that it was found expensive to maintain the weir; a rightly-constituted mind would be forced, with great reluctance, to the conclusion, that by not doing what no one seems to have deemed of the slightest importance to any living being, the plaintiff had forfeited a valuable interest, enjoyed, unsuspected of latent defect, during a long course of years. Considerations such as these, at one time, induced the English courts of equity to favor the doctrine that, where no injury had in fact been inflicted by the non-performance of a condition, or only such as might be compensated in pecuniary damages, equity would not permit a forfeiture of the

estate: Cage *v.* Russell, 2 *Vent.* 352; Rose *v.* Rose, *Amb.* 331; Duke *v.* Northcote, *id.* 511; Wofer *v.* Mocotto, 9 *Mod.* 112; Saunders *v.* Pope, 12 *Vesey* 282; and WOOD, Baron, in Bracebridge *v.* Buckley, 2 *Price* 200. And, though Lord ELDON and succeeding chancellors have since confined this rule to conditions of re-entry for non-payment of rent, it may, at least, admit of question, whether, in cases like the present, the courts of this country would not lean in favor of the liberal extension of the rule, in prevention of injustice. Certain it is, that in Skinner *v.* Dayton, 2 *Johns. Ch.* 535, and Livingston *v.* Tompkins, 4 *id.* 431, Chancellor KENT seemed willing to recognise the general application of the doctrine of relief, where compensation can be made; and STORY, in his treatise on Equity, sec. 1320, favors the same view.

In the instance before us, however, it is unnecessary to pursue the inquiry as to the rule in chancery further, since, I think, it is clear that, under the most stringent application of common law principles, no technical condition can be extracted from the language of the deed before us. In the endeavor to ascertain its legal effect, the plaintiff is entitled to the benefit of the maxim which declares conditions to defeat an estate odious, and that they are to be taken most strictly. Where a party has another remedy, no judge should declare a condition of forfeiture, unless compelled to it by rigid and unbending rule, ascertained by settled authority. Where the language of an agreement can be resolved into a covenant, the judicial inclination is so to construe it; and hence it has resulted that certain features have ever been held essential to the constitution of a condition. In the absence of any of these, it is not permitted to work the destructive effect the law otherwise attributes to it.

As proper to frame a condition, certain words are recognised, which, of their own nature and efficacy, without the addition of other words, are sufficient. Among these, three are said to be most appropriate to make an estate conditional; namely, *proviso,* *ita quod,* and *sub conditione.* And, therefore, if one grant lands to another in fee, provided that, or so as, or under this condition, that the grantee pay to the grantor £10 at a certain time, this is a good condition, without words of re-entry: *Shep. Touch.* 121. Now, in that clause of the deed particularly under review, we have the apt words "under this condition, nevertheless;" and hence it is argued, that by the legal import necessarily attributable to them, the interest reserved in the water is a conditional interest. But this argument overlooks the well-settled principle, that these conditional words sometimes serve to work a qualification or limitation, and sometimes to make a covenant only, according to the intention of the parties and the manner in which they are used in a conveyance. In Cromwell's case, 2 *Co.* 71 a.,—a leading authority upon this point,—it was settled, that though the words

[Paschall *v.* Passmore.]

*proviso* and *sub conditione* are apt to make a condition, yet, to confer upon them this effect, three things are necessary; first, that the clause wherein they occur, have no dependence on another sentence in the deed, but stands originally by and of itself; second, that it be the language of the feoffor, donor, lessor, &c.; or may be attributed, indifferently, to both; and third, and principally, that it be compulsory to enforce the bargainee, feoffee, donee, &c. to do an act, the omission of which may work a forfeiture. The same requisites are recognised by the *Touchstone*, p. 122, and it is added, "but if the clause have dependence on another clause of the deed, or be the words of the feoffee, &c. to compel the feoffor to do something; then it is not a *condition, but a covenant only*." As illustrative of this doctrine, the following cases are put:—If there be in the deed a covenant that the lessee shall scour the ditches, and then these words follow, "provided that the lessor shall carry away the earth;" or, if there be a covenant that the lessee shall repair the houses, and then these words follow, "provided the lessor do provide timber," it is no condition, but a covenant. Now, in the case before us, as the defendant insists, the language relied on is the language of the grantor, and is compulsory, not on the grantee, but on the grantor himself, in respect of an estate or interest not derived from the grantee, but retained by the grantor. The books furnish no instance of such a reserved interest being defeated by an omission of the owner to perform a self-imposed undertaking. Besides, as something to be done by the grantor himself, it is precisely analogous to the instances just given, which, though clothed in the language of a condition, amount but to a covenant. On the argument, the defendant's counsel cited Holden *v.* Taylor, a note of which is found in 6 *Vin. Abr.* 378–9 (c.) 2, 3, to this effect:—"If a lessee covenant to repair, provided always that the lessor shall find great timber, without the word 'agreed;' this proviso shall not make any covenant on the part of the lessor, but it shall be only a qualification of the covenant of the lessee:" though it is conceded that, had the word "agreed" followed the word "provided," it would have been a covenant. Had this case determined that the undertaking to repair was a condition, by force of the proviso, it would be in direct contradiction of all the other authorities. But it asserts nothing of the kind. It but ascertains that, as the furnishing of timber was necessary before the repairs could be made, the neglect to furnish excused a non-performance by the tenant of his covenant, qualified by the undertaking of the lessor.

On the ground, then, that the bridge was to be erected by the grantor and not by the grantee, being a self-imposed duty, to which no forfeiture is specifically attached, the undertaking cannot be regarded as in the nature of a condition. Nor is it a qualifi-

[Paschall *v.* Passmore.]

cation of the grantee's covenant; since that was to be performed before any thing done on the part of the grantor.

But it is also a rule, that, to make a technical condition, the clause in which it is found be applicable to the thing granted, and not to some other thing. As, if a lease be made for years, without impeachment of waste, provided the house be not voluntarily pulled down; this is said to be an exemption from waste, with a qualification, which, however, doth not make the estate conditional. Our case is directly within this principle; for the words of condition are applicable, not to the estate granted, but to something which never was granted.

This review of authority proves, I think, beyond doubt, that the undertaking of Paschall was not in the nature of a condition, but of a covenant simply. From what has been said, it is palpable, too, that it is a covenant not constituting the whole consideration of the reservation, but is in fact only a part, and probably a very small part, of the inducement of the concession made by the grantee; and, as it may be compensated in damages, it falls within the rule laid down at Nisi Prius.

I may say, in conclusion of this part of the case, that, were it necessary, it might perhaps be shown that by the subsequent deeds and agreements between these parties, shifting the location of the race and giving to the grantor the right of shutting up, for pasturage, the land through which it runs, there was a tacit waiver of the undertaking to build a bridge, which could only be necessary for the purposes of a cart-way, originally contemplated, but afterwards rendered useless, if not impracticable, by the acts of the parties themselves. This seems to have been the understanding of all interested, who have for a quarter of a century acquiesced in the sufficiency of the small foot-bridge maintained by the plaintiff, and which was the only means of crossing at the waste weir when the defendant purchased. From the beginning, until after this suit was brought, the successive owners have gone on, not only without objection to this arrangement, but without dreaming of complaint, though quarrelling upon other topics connected with the dam and race. After all this, a court of justice would not willingly open its ears to exceptions such as I have been considering.

There is nothing in the remaining errors. The answers returned by the court below to the other propounded points were beyond question correct.

Judgment affirmed.