Margiotti Appeal.

Argued August 16, 1950. Before DREW, C. J., STERN, STEARNE, JONES, BELL and LADNER, JJ.

*Charles J. Margiotti*, Attorney General, in propria persona, and *W. Denning Stewart*, Special Deputy Attorney General, with them *Harry F. Stambaugh*, Special Counsel, for appellant.

*William S. Rahauser*, District Attorney, in propria persona, and *Earl F. Reed*, Special Assistant District Attorney, with them *Loran L. Lewis*, Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, August 31, 1950:

We assume—as fairly we must in the absence of evidence to the contrary—that neither the District Attorney of Allegheny County nor the Attorney General of the Commonwealth has been guilty of any improper motivations in the performance of their respective official duties in connection with the events giving rise to the present controversy. The question for this Court to determine is whether statements of the District Attorney, his actions, failure to act, delays in action, or conduct in general, however free from any purposeful wrongdoing, justified the Attorney General, in the ex-

ercise of his quasi-judicial discretion, in concluding that it would be in the public interest and for the public welfare to supersede him in the direction and control of a grand jury investigation of violations of the law in the use of city labor and materials of the City of Pittsburgh.

In *Commonwealth ex rel. Minerd v. Margiotti,* 325 Pa. 17, 30, 31, 188 A. 524, 530, Mr. Justice SCHAFFER (later Chief Justice), in a learned and comprehensive opinion, after tracing the history of the office of Attorney General and the origin and evolution of its powers and duties, stated the conclusion of the court to be, "from the review of decided cases and historical and other authorities, that the Attorney General of Pennsylvania is clothed with the powers and attributes which enveloped Attorneys General at common law, including the right to investigate criminal acts, to institute proceedings in the several counties of the Commonwealth, to sign indictments, to appear before the grand jury and submit testimony, to appear in court and to try criminal cases on the Commonwealth's behalf, and, *in any and all these activities to supersede and set aside the district attorney when in the Attorney General's judgment such action may be necessary.*"

In *Dauphin County Grand Jury Investigation Proceedings (No. 1),* 332 Pa. 289, 298, 2 A. 2d 783, 788, this Court, speaking through Mr. Chief Justice KEPHART, said: "But the Attorney General, with his vast powers, recognized by this Court in Commonwealth ex rel. v. Margiotti, 325 Pa. 17, may supplement and supervise the grand jury in any investigation; he may,—and it is his duty to do so if he believes the government is to be hindered in the lawful conduct of its affairs to the detriment of the security, peace and good order of the State,—*supersede the District Attorney in the conduct of the entire investigation;* or he may,

if he believes better results will be obtained, act in conjunction with the District Attorney."

In *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, 332 Pa. 358, 364, 365, 2 A. 2d 809, 812, 813, the question was considered whether there was any restriction whatever upon the power of the Attorney General to supersede the District Attorney of a county,—whether "the extent of the discretion possessed by him" was "so illimitable as to be beyond the pale of judicial review." The conclusion of the Court was that, "from the legal standpoint, such discretion may be abused, and, if so, its exercise cannot be sustained"; the Attorney General, being a quasi-judicial officer, must not act arbitrarily or from caprice but only "upon the foundation of reason"; his discretion must be *"reasonably based upon the attendant pertinent circumstances from which its exercise arises."* And it was further held that "Whether the discretion vested in the Attorney General has been abused or has been exercised within proper legal limitations is necessarily a question for the determination of the court."

Such being the established law, which, as all the counsel engaged herein agree, controls the present issue, what are the facts to which it is here to be applied? Accepting only those not in dispute, it appears from the averments in the numerous pleadings filed, the exhibits thereto attached, and the testimony taken at the hearing in the court below, that, over the course of several years, employes of the City of Pittsburgh, with the connivance and even by the express direction of certain city officials, have been using for private purposes materials belonging to the city and labor paid for by the city. The first revelation of the existence of such illegal practices resulted from the happening of an accident to a truck in which a city employe, then working on city time and for city pay, was killed while being

transported in a neighboring county for the purpose of working on a building there being constructed for a city official, and the truck was carrying a load of cement belonging to the city to be used on private property. This occurred on April 26, 1949, and the attendant facts and circumstances presumably became matters of public knowledge. However, no action was taken by anyone nor was any general interest apparently aroused until April 25, 1950, when the present Attorney General, then a private practitioner, instituted a suit against the corporation which owned the truck and against several individuals to recover damages for the employe's death on behalf of his widow and children, and also filed a claim against the city for workmen's compensation. A public agitation thereupon began for an official investigation of the probable extent to which city employes and officials had been criminally appropriating to their own use property of the city and labor of its employes, in violation of their public trust. The local newspapers published vigorous articles and editorials demanding such a probe and calling on the District Attorney to act through the medium of a grand jury investigation; civic organizations made similar demands, and both they and the newspapers began vehemently to criticize the inaction of the District Attorney and to suggest that the Attorney General's office should take matters in hand. At first the District Attorney reputedly said, in substance, that he was not interested and that he did not think a grand jury investigation was necessary.[1] The City Solicitor, under obvious legal handicaps, made an in-

---

[1] In his rejoinder to this charge made in the Attorney General's replication the District Attorney stated that "It is denied that *after credible evidence was produced* the District Attorney made any public statement to the effect that he was not interested in, and that he did not think a grand jury inquiry was necessary."

vestigation, and the City Controller likewise started one but discontinued it because he could not compel the attendance of witnesses and because in a councilmanic investigation which began on June 13, 1950, and lasted until June 22, 1950, evidence of misuse of city labor and materials was presented against himself. At the conclusion of their investigation Council filed a report on June 30, 1950, which merely recommended the dismissal of two city employes—not their criminal prosecution—and censured two city officials. It may parenthetically be noted that during the course of this councilmanic inquiry a city clerk committed suicide after stating to his wife that, at the direction of his official superior, he had falsified public records bearing on these matters.

On the same day of the filing of the councilmanic report the District Attorney presented a petition to the Court of Quarter Sessions praying for an order directing the then present grand jury to have witnesses summoned before it for the purpose of investigating "violations of law committed by the *employes* of the City of Pittsburgh with reference to the use of labor and materials of the City of Pittsburgh in fields of endeavor of a private nature." This petition, notwithstanding the District Attorney's insistence to the contrary, was patently defective and legally inadequate in view of the rulings of this Court[2] to the effect that, in order to warrant a grand jury investigation there must be averred, on direct knowledge or knowledge gained from trustworthy information, that a criminal act has been committed and that there are other similar acts which show a system of crime has been, or is, in

---

[2] *McNair's Petition*, 324 Pa. 48, 187 A. 498; *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 2 A. 2d 783; *Philadelphia County Grand Jury Investigation Case*, 347 Pa. 316, 32 A. 2d 199.

the process of commission. However, the court granted the District Attorney's petition and summoned the grand jury to report on July 10, 1950, for the purpose of the proposed investigation, and the District Attorney then assigned county detectives to assist in obtaining evidence and issued subpoenas for the appearance of witnesses.

On July 5, 1950, the Attorney General was appointed to office, and on July 7, 1950, he served on the District Attorney an order, dated July 6, 1950, superseding him in connection with all matters relating to the criminal acts of any and all public officials and public employes within the jurisdiction of the court, "including the investigation of charges, the proceedings before the grand jury, the trial or trials, and any and all matters relating thereto." On the same day, July 7, 1950, the Attorney General petitioned the court for revocation of its order of June 30, 1950, summoning the grand jury. To this petition the District Attorney filed an answer; the Attorney General filed a replication, the District Attorney a rejoinder, and the Attorney General a sur-rejoinder. The Court below held a hearing, took some testimony, and entered an order holding that the Attorney General had abused his discretion in superseding the District Attorney; the supersession was accordingly vacated, the Attorney General's petition for the revocation of the order summoning the grand jury was dismissed, and the District Attorney was directed to proceed forthwith with the grand jury investigation. From this decision the Attorney General now appeals to this Court. It may be added that following the hearing in the court below but before the announcement of its decision the District Attorney filed an amended petition for the summoning of a grand jury in which he now stated that he had acquired definite knowledge from his own investigations and from testimony given at the councilmanic investi-

gation that certain employes and *elected officials* of the City of Pittsburgh committed a series of unlawful acts and conspired to cheat and defraud the city; a summary of that testimony was set forth and averments made to meet the requirements of the decisions of this Court previously referred to.

Such being the facts, the question recurs: Was the Attorney General's discretionary power to supersede the District Attorney lawfully exercised by him or did he abuse that discretion? How did the situation reasonably appear to him as justifying the action which he took? He saw that a grave situation existed in which revelations of criminality on the part of some city employes and officials indicated the possibility, if not the likelihood, of a widespread misuse of public property, and faithlessness in the performance of public duties. He saw that thereby the confidence of the citizenry in the integrity, at least of those in charge of the department of city government in which such criminality had been shown to exist, was being dangerously undermined. He saw that during the year ensuing after the accident of April 26, 1949, no investigation had been made by the agencies of law enforcement as to the reason for the presence at that time and place of the city employe who was the victim of the accident and as to the mission on which he was engaged. He saw that even after the institution of the suit at law and the filing of the claim for workmen's compensation, when the newspapers and the public generally came to sense the seriousness of the situation, nothing was promptly done in the way of official investigation except by the City Solicitor, limited in her power, by the City Controller, similarly limited and with himself under attack, and by the City Council, a legislative body without power, of course, to enforce the criminal law. He saw that the continuing delay might result in the loss of evidence through departure or death

of witnesses (one of whom, as already stated, did commit suicide) and even in the barring of prosecutions by the statute of limitations. He saw that it was not until June 30, 1950, after clamor by citizens and by the public press and after there were intimations that he himself might assume office and intervene, that the District Attorney filed a petition for a grand jury investigation. He saw that that petition referred only to city employes, not to city officials, and that it was legally defective. He saw that, while the District Attorney could not properly request a grand jury investigation until he had obtained reliable evidence of the commission of a general series of crimes, the District Attorney had not attempted on his own behalf to obtain such evidence until the councilmanic inquiry began and had then merely sent county detectives to check on the testimony there given. In view of all these circumstances, which the Attorney General presumably weighed and considered, can it be said that he abused his discretion—that he acted arbitrarily, capriciously, unreasonably—in concluding that, in the public interest and for the public welfare, it was desirable, proper, and even incumbent upon him to supersede the District Attorney in the investigation which the grand jury was to conduct? The court below was of opinion that his action was unjustified because the District Attorney had already obtained—though on a vulnerable petition—the summoning of a grand jury and thereby the object of the agitation had been accomplished. But this indicates a misconception of the real question, which is whether the District Attorney's past attitude in regard to the need for a grand jury investigation and his apparent failure to proceed with the alertness, the zeal, the vigor and the aggressiveness which the situation so obviously required, did not fairly support a reasoned belief on the part of the Attorney General that the prosecution of these vitally important in-

quisitorial proceedings should be conducted by the chief law officer of the State, whose function it is to see that the criminal laws of the Commonwealth are enforced, having the advantage of the use of the State police for that purpose. Whether or not the Attorney General's discretion was *wisely* exercised is not for us to determine; it is *his* discretion which governs, not that of the court; the court is concerned only with the question whether its exercise was within the limits of the Attorney General's *power* and was not an abuse of that power. It is our conclusion that it did *not* constitute such an abuse. Nor is this conclusion based upon the argument of the Attorney General—which we reject—that the District Attorney should be superseded because he belongs to the same political party as that presently in control of the city administration. Such a contention runs counter to the whole theory and spirit of our governmental institutions for it would mistakenly imply that partisan loyalties and subservience to party organizations are commonly paramount to respect for, and devotion to, the supremacy of the law.

The proposition advanced on behalf of the District Attorney that supersedure of a local elected official by a State appointed officer is an infringement on the principle of home rule is wholly without merit. As already stated, the common law vests in the Attorney General that discretionary power. Moreover, the doctrine of home rule applies to the desirability of a municipality's having freedom in the formulation of its own local legislation,— not to the enforcement of the criminal law *of the Commonwealth*.

A counter-attack has been made upon the Attorney General's qualification to conduct the grand jury investigation in this case because of alleged personal interest in the matters to be investigated arising from the fact that he was counsel for the widow of the city employe killed in the accident and instituted on her

behalf a suit to recover damages and also a claim against the city for workmen's compensation. It is sufficient to say in this regard that not only did the Attorney General withdraw as counsel in that litigation and from all representation of his client at the time he served the order of supersedure but, in any event, there was no conflict of interest involved in the attempt of his client to obtain such redress and the prosecution of city employes and officials for crimes allegedly committed by them. The same is true in regard to the representation at the councilmanic hearing of the widow of the city clerk who committed suicide, especially as the technical relation of attorney and client apparently never came there into existence.

It would seem scarcely necessary to add to this opinion the admonition that, since the sole objective of the grand jury investigation is to ascertain whether the criminal law has been violated and to bring the guilty ones to justice, it should be kept free, as we are confident it will be,[3] of personal rancors and, within its confines, of partisan exploitation.

The order of the court below is reversed. The supersession of the District Attorney by the Attorney General is hereby adjudged to have been a valid exercise of the Attorney General's discretion. The record is remanded with direction to grant the petition of the Attorney General for the revocation of the order of the court below of June 30, 1950, reconvening the June grand jury.

---

[3] In an oral statement made by the Attorney General in the court below on July 11, 1950, he said: "Your Honors, I have already appointed W. Denning Stewart as a special prosecutor, a special deputy Attorney General. . . . I intend to appoint other deputies to assist. In fact, I would like to appoint some Republicans and some Democrats as assistants to Mr. Stewart. I am now considering that question, and I intend to do that in order that the investigation would be a fair and impartial one."

DISSENTING OPINION BY MR. JUSTICE JONES:

The question involved on this appeal is not whether there should be a grand jury investigation into the alleged criminal conduct of certain officials and employees of the City of Pittsburgh. As to that, there is no difference of opinion with respect either to the propriety or need for such a proceeding. The fundamental question presented by the record is whether the learned court below erred in concluding from the pleadings and the evidence that the inquisition to that end (already begun by the District Attorney of the County) should continue to be conducted by him and that the Attorney General's attempted supersedure of the District Attorney constituted an abuse of his discretion.

It is my opinion that there is no longer any legal warrant for voluntary action by the Attorney General in such regard even if the power ever existed which I firmly dispute. However, the majority of the court, relying upon what I take to be non-decisional expressions of opinion in several relatively recent cases, accord to the Attorney General common law power so to act: see *Commonwealth ex rel. Minerd v. Margiotti*, 325 Pa. 17, 188 A. 524, (1936), *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 2 A. 2d 783, (1938), and *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, 332 Pa. 358, 2 A. 2d 809, (1938). Even a cursory reading of the opinions in those cases will readily disclose that no question as to *common law* power in the Attorney General to supersede a District Attorney of his own motion was present for decision. Indeed, the matter had never been passed upon at common law for the all-sufficient reason that elected prosecuting officers were unknown to its political institutions. Ever since the creation of the offices of Attorney General and Solicitor General in England several centuries ago, prosecuting attorneys

(beyond the two officers just mentioned) have been and still are the Attorney General's own appointees and, of course, subject to removal or supersession by him at his pleasure. Manifestly, no analogy can rightly be drawn between that system and the system which has obtained in Pennsylvania since the creation of the office of elective District Attorney by the Act of May 3, 1850, P.L. 654, Sec. 1,—an office later, and still, ordained by the Constitution of 1874 (Art. XIV, Secs. 1 and 2). The idea that a mere political appointee, beholden to his appointer and not to the people for his tenure, can, of his own volition, set aside and supersede a duly elected constitutional officer runs counter to even the most limited conception of the republican form of democratic government which this Commonwealth was established to secure and maintain and which the National Government is charged by the Federal Constitution (Art. IV, Sec. 4) to guarantee to every State.

Inasmuch as this is the first time that the question of the Attorney General's asserted power to supersede a District Attorney has been squarely before this court for decision, I had thought that it would be examined and considered for what it truly is, viz., a matter of first impression as well as of first importance. But, a majority of the court see fit to enter an order of reversal which automatically will constitute a *decision* that the Attorney General does possess such power by virtue of the common law when in his judgment such action is necessary. I shall not, therefore, prolong this opinion by further discussion of the basic legal fallacy in the majority's action. However, it is not untimely to observe in passing, as did the learned court below, that ". . . the supersedure of a District Attorney by an Attorney General, in the exercise of his common law powers, is without precedent in the history of this Commonwealth." And, to that, it may be added that

the threat thereby to the orderly processes of popular government is serious indeed.

But, even if *Commonwealth ex rel. Minerd* and the *Dauphin County Grand Jury (No. 1)* and *(No. 3)* cases settled the law in this State that the Attorney General possessed common law power to supersede, of his own motion, an elected District Attorney, I submit that such power was completely extinguished by the Act of March 20, 1939, P.L. 8, in its repeal of the Act of July 30, 1938, P.L. 17, the latter being Act No. 3 of the Special Session of that year and entitled "An Act Defining the relative powers of the Attorney General and of district attorneys in investigations or proceedings in the criminal courts . . . ." The Act of 1938 conferred upon the Attorney General power to supersede and set aside, in his absolute discretion, the District Attorney of a County at any stage of an investigation or proceeding pending in the criminal courts of such County. It came before this court for construction in *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, supra, where it was flatly held that the discretion statutorily so conferred was, at most, a legal discretion and, as such, reviewable for an abuse. In other words, the power reposed by the Act was construed to be the same as the power possessed by the Attorney General by virtue of the common law as recognized in *Commonwealth ex rel. Minerd*, supra. In that connection, Mr. Justice STERN, speaking for this court, said with respect to the Act of 1938,—"It is obvious, then, that Act No. 3 merely confirms in statutory form the possession by the Attorney General of a power which had theretofore been enjoyed by him under the usage and traditions of the common law." Thus, what had been deemed in the *Minerd* and *Dauphin County Grand Jury* cases, supra, as being a common law power of the Attorney General became by legislative adoption a part of the statute law of the State.

But, at the very next session of the General Assembly, Act No. 3 of 1938 was "repealed absolutely" by the Act of March 20, 1939, P.L. 8, so that what of the common law had been incorporated in our statute law by the Act of 1938, relating to the public officers named therein, was by positive and unmistakable terms eliminated therefrom by the Act of 1939.

The common law rule of statutory construction that the repeal of an Act declaratory of the common law does not operate to extinguish *private rights* otherwise vested by the common law has never been extended in a single instance, so far as my research discloses, to revive in a public official a repealed statutorily-conferred power of office formerly derived from the common law. Indeed, the attitude of the law toward revival of prior law by a repeal of another law has been to restrict the rule of revival. For example, the common law rule that the repeal of a repealer revived the prior law was abrogated in England by statute a hundred years ago and many of the States of the Union have similar enactments: Endlich on Interpretation of Statutes, §476, p. 679. With us, such legislative declaration is now embodied in Section 97 of the Statutory Construction Act of May 28, 1937, P.L. 1019, which provides that "The repeal of a repealing law shall not be construed to revive the law originally repealed." In any event, the scope of the repeal Act of 1939 is simply a question of legislative intent. If the legislature intended thereby to do less than completely obliterate any semblance of power in the Attorney General to supersede at his own discretion a District Attorney, why did it define the extent of the repeal by the most comprehensive term it could have used, namely, "absolutely" and not prescribe a substitute? Or, why did it bother at all to enact the repeal if concomitantly therewith the very same power from the common law would be revived? There is a legal pre-

sumption that the legislature did not intend a result so vain and absurd: see Section 52(1) of the Statutory Construction Act of 1937. The plain intent of the legislature by the repeal of 1939 was to make an end, once for all, of the idea that an appointed Attorney General could, of his own motion, supersede and set aside a duly *elected* constitutional officer. No other construction of that Act is reasonably deducible, especially, in view of the fact that it affects officers of government and their powers which, in this country since the change wrought by the Revolution, have been peculiarly matters of *written* law beginning with the Constitutions.

On the basis of the foregoing, it is my opinion that there is not now any extant lawful authority in an Attorney General of Pennsylvania to supersede at his discretion a District Attorney of the Commonwealth. And, beyond that, I fail to see the slightest legal justification for this court's reversal of the learned court below on the merits assuming that the Attorney General still possesses power to supersede a District Attorney at his discretion.

In *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, supra, where the then Attorney General sought to supersede the District Attorney of Dauphin County in a grand jury investigation then pending in the criminal courts of that County, this court held it to be incumbent upon the Attorney General "to present to the [local] court his reasons for superseding the district attorney . . ., the court thereupon to determine the question whether the district attorney has been superseded by a valid exercise of the legal discretion vested in the Attorney General . . . ." The requirement, of course, contemplated that the reasons given be valid and substantial. And, the burden of proving their validity and substance necessarily rests upon the Attorney General from the very nature

of the situation. The duty of establishing by proof a fact material to an inquiry ordinarily lies upon him who asserts it. Nor can the rule be otherwise where the Attorney General seeks to supersede of his own motion, by virtue of some common law power, a constitutional officer charged by law primarily with the duty of signing "all bills of indictment, and conduct-[ing] in court all criminal or other prosecutions in the name of the commonwealth, or when the state is a party, which arise in the county for which he is elected . . .": see Act of 1850, supra.

In the present instance, except for the single reason first assigned by the Attorney General in support of his order of supersedure, to wit, that the District Attorney's petition for the reconvening of the June grand jury was defective, the principal matter urged by him, among the additional grounds which he later advanced as supporting his action, is his charge and innuendo that the District Attorney meant deliberately and wilfully to fail in the faithful discharge of his sworn duty. Plainly enough, the first reason was unsubstantial and the learned court below justifiably found it so to be. The petition was amendable (see *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 2 A. 2d 783) and was actually amended upon leave of the court below. The Attorney General is in no position to complain of that. He had no vested private right in the continued maintenance of what he had asserted to be a defective petition. The other reason was wholly unsupported by any evidence and was left to rest entirely on the contention that because the District Attorney was a member of the same political party as some of the persons to be investigated, he would be recreant to the trust reposed in him by the electorate of the County. The learned court below found that reason to be invalid as does also the majority of this court because the "contention runs counter to the whole the-

ory and spirit of our governmental institutions . . . ." The delay charged against the District Attorney because he did not move for the institution of a grand jury proceeding until after the "Councilmanic probe" had been concluded was expressly found by the court below *not* to have been an improper exercise of judgment.

The findings of the court below are ignored by the majority in plain disregard of a well-settled and time-honored rule of law that the findings of fact of a trial court, approved by a court en banc, have the weight of a jury's verdict and are conclusive on appeal if there is any evidence to support them. The only evidence this record lacks is what the Attorney General failed to produce as support for his charge of political bias and bad faith on the part of the District Attorney. Thus, by ignoring the lower court's competent findings, which are implicit, where not verbally detailed, in its comprehensive treatment of each of the reasons assigned by the Attorney General, the majority of this court usurp the province of the trial court and draw their own ultimate conclusion of fact that the Attorney General's supersedure of the District Attorney was a valid exercise of his discretion.

Naturally, there is no definitely fixed standard by which the exercise of a legal discretion can be measured for validity. Any determination of such a nature must necessarily depend upon a judicious review and consideration of all attendant relevant circumstances. The court below, which heard this matter at great length and painstakingly prepared and filed a thorough and well-considered adjudication, was fully qualified to make a just factual conclusion and, having done that, its work should not now be set aside except for some identifiable and reversible error which, so far as I can see, the majority opinion fails to point out. All the majority opinion does is to relate facts and circum-

stances including "clamor by citizens and by the public press" which the Attorney General could have taken and presumably did take into consideration in coming to his conclusion to supersede the District Attorney. The majority then states that "Whether or not the Attorney General's discretion was *wisely* exercised is not for us to determine . . . ." But, that is precisely what the court below had for determination under all the circumstances including the record evidences concerning the Attorney General's motivations which the majority opinion expressly excludes from consideration. A discretion that is not exercised wisely is abused. "The very term [discretion] itself, standing alone and unsupported by circumstances, imports the exercise of judgment, *wisdom,* and skill . . ." (Emphasis supplied) : *Paschall v. Passmore,* 15 Pa. 295, 304.

In *Dauphin County Grand Jury Investigation Proceedings (No. 3),* supra, Mr. Justice STERN said for this court that "To him [i.e., the Attorney General], therefore, is peculiarly applicable the familiar doctrine that courts and all judicial and quasi-judicial officers must exercise discretionary powers upon the foundation of reason, as opposed to prejudice, *personal motivations,* caprice or arbitrary action" (Emphasis supplied). In the light of that pronouncement, is it not strange that "motivations" now become immaterial in the opinion of the majority? The Attorney General's charges impugning the honor and integrity of the District Attorney were found by the court below, and now by this court, not to have been sustained. What, then, is there left to support the majority's opinion that the Attorney General's order of supersedure was a proper exercise of his discretion? Only that official's bald assertion that the District Attorney had lost public confidence and would, therefore, be unable to conduct a thorough and effective investigation,—an allegation which the court below rejected as not having been sus-

tained by evidence. Loss of public confidence, where it exists, is a fact; and who is in better position to determine whether such was the fact in the present instance than the three local judges of the court below who, with becoming judicial firmness, were able to stand steadfast against the "clamor by citizens and by the public press" to which the majority opinion makes reference as support for the Attorney General's action.

By the charge that the District Attorney, because of his political affiliations, will not perform his official duties faithfully (the Attorney General even avers in his replication that it would be "contrary to all normal experience to expect" him to indict City officials and employees), the Attorney General thereby gives utterance to a strange conception of official morality. He apparently does not understand that the innermost feeling of any decent *elected* public officer is that he but enjoys for the time a power reposed in him by the people to be exercised by him with an eye single to the public interest. In view of the Attorney General's flagrant charges, based on the imputation of bias and partiality in *elected* public officials because of their political affiliations, it is not amiss to interpolate at this point that two of the three judges of the unanimous court below are not members of the political party to which the District Attorney belongs.

Under the evidence in the case, the only party to this record, whose motives are under any stigma from possible partiality and bias for political purposes is the Attorney General himself by virtue of the very office he now occupies and the character of the proceeding here involved. Such was expressly recognized in *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, supra, where it was said that,— "The Attorney General is an appointee of the Governor and subject to dismissal by him. Under such circumstances ordinary sentiments and impulses would necessarily tend

to interfere with the Attorney General's freedom of action, even though he might not in fact succumb to the temptations which would confront him. To permit him to conduct the investigation *in such a case* would be contrary to all standards of professional ethics, as the Attorney General himself commendably recognizes, for, in the brief presented by him to this court, he disclaims any intention of handling the proceedings personally" (Emphasis supplied).

The result of this court's decision in *Dauphin County Grand Jury Investigation Proceedings (No. 3)*, supra, was ultimately to bar the Attorney General from exercising a right to supersede the local District Attorney (even though *a statute* then empowered him to do so) because of his supposed political interest and bias due to the position he then occupied. Here, the motives of the Attorney General are excluded by this court from any consideration although I have no doubt that the learned court below, faithful in its obedience to the reported pronouncements of this court, took such matters into account along with all the other facts and circumstances in concluding that the Attorney General's supersedure of the District Attorney constituted an abuse of discretion.

On the basis of the record in this case, there is no justifiable ground for inferring that the District Attorney of Allegheny County would not conduct the grand jury investigation in a thorough, efficient and impartial manner without fear of or favor to anyone. Such is the faith shown in him by the adjudication of the learned court below.

I would affirm on that adjudication.

---

DISSENTING OPINION BY MR. JUSTICE LADNER:

I cannot agree with the majority opinion in its holding that the court below erred and should be re-

versed. It seems to me that when the attorney general asserts his high prerogative, and his assertion of it is challenged, the burden is on him to justify his act of supersession, see *Com. ex rel. v. Philadelphia,* 176 Pa. 588, 35 A. 1135 (1896). This is not a case where the district attorney refused or even failed to act. The district attorney had in fact acted and was proceeding apparently with reasonable diligence when he was superseded without being given an opportunity to show his good faith or sincerity.

In a case such as this much reliance ought to be placed on the good judgment of the court below, because it is in a far better position to know the calibre, ability and sincerity of the district attorney, as well as the relevant surrounding circumstances of the case, than we, who have before us only the cold record. The court below has, in its opinion, carefully considered, analyzed, and I think satisfactorily disposed of all the reasons advanced by the learned attorney general in justification of his order of supersession.

I would therefore affirm the decision appealed from.