**STATE OF FLORIDA ex rel. Robert L. SHEVIN, Attorney General, Plaintiff-Appellant,**

v.

**EXXON CORPORATION et al., Defendants-Appellees.**

No. 74–3309.

United States Court of Appeals, Fifth Circuit.

Jan. 22, 1976.
Rehearing and Rehearing En Banc Denied March 10, 1976.

Daniel S. Dearing, Chief Trial Counsel, Dept. of Legal Affairs, Civil Div., Syd-

ney H. McKenzie, III, Chief Trial Counsel, Robert Shevin, Atty. Gen., Tallahassee, Fla., for plaintiff-appellant.

John R. Lawson, Jr., Tampa, Fla., Robert R. Feagin, III, Lakeland, Fla., Roy C. Young, Tallahassee, Fla., for Union Oil of Calif.

William O. Mehrtens, Jr., David S. Batcheller, Miami, Fla., for Standard of Calif.

Harry Kemker, Tampa, Fla., William J. Lowry, Findlay, Ohio, for Marathon.

William Simon, Washington, D. C., J. Robert McClure, Jr., Tallahassee, Fla., for Exxon Corp.

Robert McGinnis, New York City, for Texaco, Inc.

Wade L. Hopping, Tallahassee, Fla., John E. Bailey, Jesse P. Luton, Jr., Houston, Tex., Harry P. Davis, Jr., Atlanta, Ga., for Gulf Oil.

Jack M. Skelding, Jr., John A. Madigan, Jr., Tallahassee, Fla., Donald Frickel, Andrew J. Kilcarr, Washington, D. C., for Mobil Oil.

Thomas A. Clark, Tampa, Fla., Harold F. McGuire, New York City, Wm. Reece Smith, Jr., Tampa, Fla., Oliver L. Stone, Houston, Tex., for Shell Oil.

Wilfred C. Varn, Tallahassee, Fla., Richard E. Hill, Washington, D. C., William VanDercreek, Tallahassee, Fla., Robert E. Jordan, III, Washington, D. C., for Atlantic-Richfield.

Patrick G. Emmanuel, John G. Harkins, Jr., Pensacola, Fla., Barbara W. Mather, Philadelphia, Pa., for Sun Oil.

Reginald L. Williams, Miami, Fla., John Dickey, New York City, Daniel Walbolt, Tampa, Fla., Lewis J. Ottaviani, Bartlesville, Okl., for Phillips Petroleum Co.

Turner H. McBaine, Pillsbury, Madison & Sutro, San Francisco, Cal., for Stan. of Calif.

W. M. O'Bryan, Ft. Lauderdale, Fla., Russell H. Smith, Darrel A. Kelsey, Tulsa, Okl., for Cities.

C. Lansing Hays, Jr., Otto C. Kitsinger, II, New York City, Richard S. Banick, Harold L. Ward, Miami, Fla., for Getty Oil Co.

W. B. Dickenson, Jr., Tampa, Fla., J. King Rosendale, The Standard Oil Co., Cleveland, Ohio, for Standard Oil Co. (Ohio).

M. J. Keating, Chicago, Ill., J. Lewis Hall, Tallahassee, Fla., for Standard Oil Co. (Indiana).

A. Thomas Biggers, Richard R. Linn, Houston, Tex., W. H. F. Wiltshire, Pensacola, Fla., for Continental Oil.

Before TUTTLE, THORNBERRY and COLEMAN, Circuit Judges.

THORNBERRY, Circuit Judge:

In July of 1973, the State of Florida through its Attorney General commenced an ambitious and highly publicized antitrust action against seventeen major oil companies[1] in federal district court. Among the preliminary questions raised by the defendants was the right of the Attorney General, under Florida law,[2] to initiate this action without explicit authorization from other departments, agencies, and political subdivisions of the state.[3] Prior to ruling on the many other motions before it, the district court sought to resolve this threshold issue by staying the action in

[1]. The complaint, under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), and §§ 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18 (1970), alleged a worldwide scheme of anticompetitive activities in the production, transportation, refining, and marketing of petroleum and petroleum products. The Attorney General seeks treble damages, divestiture, and injunctive and declaratory relief.

[2]. Although state law determines this issue, it should be noted that jurisdiction in the action is founded solely on 15 U.S.C. §§ 15, 26 (1970) —the federal antitrust laws—and that the diversity jurisdiction of the federal courts has not been invoked.

[3]. Although the suit is in the name of the state as a whole, it seeks to recover damages allegedly suffered by the state as a consumer, which have accrued directly to the constituent units of the state—its "agencies, departments, and political subdivisions."

order for the Attorney General to obtain a declaratory judgment in the Florida courts. The Attorney General, deeming Florida law clear on the point, instead prosecuted an abortive appeal to this Court, which we dismissed without opinion for lack of a final order. The district court has since removed this obstacle, dismissing the action as one beyond the Attorney General's authority.

This appeal followed, with the Attorney General vigorously asserting his right to institute the lawsuit and the defendants contesting it. The oil companies, however, do not forcefully urge affirmance of the district court; they argue instead that the issue is a delicate and difficult one of state law which should be certified to the Florida Supreme Court for its definitive decision. We decline to do so under the circumstances here presented and find the Attorney General to be properly in federal court on behalf of Florida. We therefore reverse.

## I.

The office of attorney general is older than the United States and older than the State of Florida.[4] As chief legal representative of the king, the common law attorney general was clearly subject to the wishes of the crown, but, even in those times, the office was also a repository of power and discretion;[5] the volume and variety of legal matters involving the crown and the public interest made such limited independence a practical necessity. Transposition of the institution to this country, where governmental initiative was diffused among the officers of the executive branch and the many individuals comprising the legislative branch, could only broaden this area of the attorney general's discretion.

As a result, the attorneys general of our states have enjoyed a significant degree of autonomy.[6] Their duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law.[7] There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires.[8] And the attorney general has wide dis-

**4.** Although the king appeared in court by his attorney even in the earliest period of English legal history, it was not until the sixteenth century that powers were consolidated in a single attorney who could be called "the chief representative of the crown in the courts." VI W. Holdsworth, *A History of English Law,* 457–61 (2d ed. 1971).

**5.** *See* VI W. Holdsworth, *supra* note 3, at 466–69, 470; XII *id.* 305.

**6.** This is particularly true where, as in Florida and most of our states, the attorney general is an official independently elected by the people. The significance of the attorney general's status as an official directly chosen by the people was recognized by Justice Ervin of the Florida Supreme Court in these terms:

The Attorney General is elected by the people; he is entrusted by them with the common law power to legally represent them or some of them in matters deemed by him to affect the public interest. . . . *Regardless of the effectiveness of his efforts in particular public legal situations, at least the people have the continuing satisfaction of knowing that their elected Attorney General has the right to exercise his conscientious*

*official discretion to enter into those legal matters deemed by him to involve the public interest, even though not expressly authorized by statute.*
State ex rel. Shevin v. Yarborough, 257 So.2d 891, 895 (Fla.1972) (Ervin, J., concurring) (emphasis added).

**7.** *See, e. g., State of Illinois v. Bristol-Myers Co.,* 152 U.S.App.D.C. 367, 470 F.2d 1276 (1972); *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 112 Cal.Rptr. 786, 520 P.2d 10 (1974); *State ex rel. Patterson v. Warren,* 254 Miss. 293, 180 So.2d 293 (1965); *State ex rel. Carmichael v. Jones,* 252 Ala. 479, 41 So.2d 280 (1949); 7 Am.Jur.2d § 6, Attorney General; 7 C.J.S. Attorney General § 5. *See generally* Shepperd, *Common Law Powers and Duties of the Attorney General,* 7 Baylor L.Rev. 1 (1955).

**8.** *See, e. g., D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 112 Cal.Rptr. 786, 520 P.2d 10 (1974); *Darling Apt. Co. v. Springer,* 25 Del. 420, 22 A.2d 397 (1941); *State ex rel. Ervin v. Collins,* 85 So.2d 852 (Fla.1956); 7 Am.Jur.2d § 6, Attorney General; 7 C.J.S. Attorney General § 5.

cretion in making the determination as to the public interest.[9]

Thus it can be seen that the common law powers of the attorney general appear, initially at least, broad enough to support the action challenged in this case. But of course, observations concerning the historic office of attorney general or that office as it "typically" exists in the United States cannot resolve the question before us. They can only provide background for inquiry into the specific constitutional and statutory provisions, and judicial decisions, which define the office of Attorney General of Florida. Only that inquiry will allow us to determine whether that office fully fits the common law paradigm or differs in significant respects.

Although the Attorney General of Florida is a constitutional officer, the relevant Florida constitutional provisions have never attempted to list specifically his powers. The first Florida Constitution, written in 1838, provided for an elected Attorney General who would attend sessions of the legislature, draft all necessary "forms of proceeding" for laws passed at the sessions, and "perform such other duties, as may be prescribed by law." [10] In the present constitution, adopted one hundred and thirty years later, no greater specificity was attempted. In defining the cabinet, including the Attorney General who "shall be the chief state legal officer," the 1968 Florida Constitution provides that: [11]

[i]n addition to the powers and duties specified herein, [the members of the cabinet] shall exercise such powers and perform such duties as may be prescribed by law.

This constitutional provision directs inquiry to the provisions of applicable "law". Does this refer only to statutory provisions defining specific functions of the Attorney General or does it include the broad and unenumerated powers of the office prescribed by the common law?

■ We find that the common law powers still obtain for several reasons. First, Florida has, since its pre-statehood period, enacted the common law in force where not in conflict with statute.[12] In addition, the statutory provision which does enumerate the Florida Attorney General's powers makes no pretense at being comprehensive; it provides in part that: [13]

---

9. *See, e. g., Mobil Oil Corp. v. Kelley,* 353 F.Supp. 582 (S.D.Ala.1973), *aff'd,* 493 F.2d 784 (5 Cir. 1973), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *In re Intervention of the Attorney General,* 326 Mich. 213, 40 N.W.2d 124 (1949); *Appeal of Margiotti,* 365 Pa. 330, 75 A.2d 465 (1950); *State ex rel. Davis v. Love,* 99 Fla. 333, 126 So. 374 (Fla.1930); 7 Am.Jur.2d § 13, Attorney General; 7 C.J.S. Attorney General § 5.

10. *Fla.Const.,* art. V (1838).

11. *Fla.Const.,* art. IV, § 4 (1968).

12. Fla.Stat.Ann. § 2.01 (1961) (derived from Act, Nov. 6, 1829, § 1). *See generally State ex rel. McKittrick v. Missouri Pub. Serv. Comm.,* 175 S.W.2d 857, 861 (Mo.1943).

13. Fla.Stat.Ann. § 16.01 (1961) provides in full: The attorney general shall reside at the seat of government, and shall keep his office in a room in the capitol; he shall perform the duties prescribed by the constitution of this state, and also perform such other duties appropriate to his office, as may from time to time be required of him by law, or by resolution of the legislature; he shall, on the written requisition of the governor, secretary of state, treasurer, or comptroller, give his official opinion and legal advice in writing on any matter touching their official duties; he shall appear in and attend to in behalf of the state, all suits or prosecutions, civil or criminal, or in equity, in which the state may be a party, or in anywise interested, in the supreme court and district courts of appeal of this state; he shall appear in and attend to such suits or prosecutions in any other of the courts of this state, or in any courts of any other state, or of the United States; he shall have and perform all powers and duties incident or usual to such office, and he shall make and keep in his office a record of all his official acts and proceedings, containing copies of all his official opinions, reports and correspondence, and also keep and preserve in his office all official letters and communications to him, and cause a registry and index thereof to be made and kept, all of which official papers and records shall be subject to the inspec-

the attorney general shall . . . have and perform all powers and duties incident or usual to such office . . ..

Finally, and most importantly, the Florida Supreme Court has consistently recognized the continuing existence of the Attorney General's common law powers. The first clear decision on the issue was the 1869 case of *State ex rel. Attorney General v. Gleason,* in which the Court held: [14]

> The Attorney-General is the attorney and legal guardian of the people, or of the crown, according to the form of government. His duties pertain to the Executive Department of the State, and it is his duty to use means most effectual to the enforcement of the laws, and the protection of the people, whenever directed by the proper authority, or when occasion arises. . . *Our Legislature has not seen fit to make any change in the common law rule.* The office of the Attorney-General is a public trust. It is a legal presumption that he will do his duty, that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern. The exercise of such discretion is in its nature a judicial act, from which there is no appeal, and over which the courts have no control.

This affirmation of the existence of the Attorney General's common law powers does not stand alone in Florida jurisprudence. It is echoed in case after case

from *Gleason* to the 1972 decision in *State ex rel. Shevin v. Yarborough,* 257 So.2d 891 (Fla.1972).[15] *See State ex rel. Ervin v. Collins,* 85 So.2d 852 (Fla.1956); *State ex rel. Landis v. Kress,* 115 Fla. 189, 155 So. 823 (1934); *State ex rel. Davis v. Love,* 126 So. 374 (Fla.1930); *State ex rel. Moodie v. Bryan,* 50 Fla. 293, 39 So. 929 (1905). We conclude that there simply is no question that such powers exist.

## II.

■ But even this conclusion does not decide the case before us. Although the Florida Attorney General has common law powers, such powers might not extend to the specific power asserted: the institution of an action under federal law, to recover damages sustained by departments, agencies, and political subdivisions which have not affirmatively authorized suit. And even if the specific common law power asserted exists as a general matter, it might be that Florida's constitutional or statutory law conflicts with the common law on that point and thus overrules it.

■ As noted earlier, Florida statutory law expressly authorizes the Attorney General to "appear in and attend to" actions in which the State is a party. *See* note 13, *supra.* Although it might be argued that this statutory power includes the power to *initiate* suit as well, there is no doubt that the common law power of the Attorney General extends this far. The Florida Supreme Court in *State ex rel. Landis v. Kress* [16] defined

---

tion of the governor of the state, and to the disposition of the legislature by act or resolution thereof.

**14.** 12 Fla. 90, 112 (Fla.1869), *quoted in State ex rel. Davis v. Love,* 99 Fla. 333, 126 So. 374 (1930) (emphasis added).

**15.** Although there is room in *Yarborough* for a difference of opinion as to the *extent* of the common law powers, the Court clearly recognized their existence: "The Attorney General inherited many powers and duties from the King's Counsellor at Common Law . . . .." 257 So.2d at 893.

**16.** 115 Fla. 189, 155 So. 823, 827 (1934). We must reject any argument by defendants that the right to "prosecute" an action does not include the right to institute the action. That term typically is used to refer, as a unit, to the institution and maintenance to a conclusion of a legal proceeding. *See Black's Law Dictionary* 1385 (4th ed. 1968); *Stewart v. Svetley,* 46 Ala.App. 601, 246 So.2d 670, 672 (1971); *People v. Zara,* 44 Misc.2d 698, 255 N.Y.S.2d 43, 46–47 (1964); *Thelin v. Intermountain Lumber & Builders Supply,* 80 Nev. 285, 392 P.2d 626 (1964); *Sigmon v. State,* 200 Va. 258, 105 S.E.2d 171, 178 (1958); *Ex parte Kelly,* 45 Okl.

this power to initiate actions in terms clearly sufficient to cover the case before us:

> The Attorney General has the power and it is his duty among the many devolving upon him by the common law to prosecute all actions necessary for the protection and defense of the property and the revenue of the state
> . . ..

This understanding was reiterated by Justice Ervin, a former Florida Attorney General, who stated that: [17]

> it is the inescapable historic duty of the Attorney General, as the chief state legal officer, to institute, defend or intervene in any litigation or quasi-judicial administrative proceeding which he determines in his sound official discretion involves a legal matter of compelling public interest.

And, contrary to defendants' contention, the Attorney General's power to institute litigation on his own initiative is not limited to quo warranto proceedings in Florida [18] or elsewhere; [19] it is as broad as the "protection and defense of the property and revenue of the state," and, indeed, the public interest requires.[20]

As to whether such authority is limited to actions under state law,[21] we again

---

577, 146 P. 444, 445 (1915); *State ex rel. Stubbs v. Dawson,* 86 Kan. 180, 119 P. 360, 364 (1911).

That the Florida Supreme Court in *Kress* did not adopt the restrictive definition contended for by defendants is evidenced by the fact that its description of the quo warranto power also did not specifically mention the right to institute an action; it was power "to determine the right of any one who claims or usurps any office . . .." Yet the Court said of this power of the Attorney General, that, where cause to institute an action exists, "the power and authority exists in him to present it without leave asked of any one. In that respect he represents the sovereignty whose attorney he is." 155 So. at 827. Similarly, the Court broadly stated that it is the Attorney General's duty "to exercise *all such power and authority* as public interests may require from time to time." *Id.* (emphasis added). Such language seems inconsistent with the very narrow meaning of "prosecute" which defendants argue was intended.

**17.** *State ex rel. Shevin v. Yarborough, supra,* 257 So.2d at 894 (Ervin, J., concurring).

**18.** For example, in *State ex rel. Davis v. Love,* 126 So. 374 (Fla.1930), the Court upheld the Attorney General's right to file a writ of prohibition against a circuit court judge. And, although not involving original institution of actions in a trial court, *State ex rel. Ervin v. Collins, supra,* (appeal); *State ex rel. Shevin v. Kerwin,* 279 So.2d 836 (Fla.1973) (appeal), and *State ex rel. Shevin v. Yarborough, supra,* (intervention) present examples of the Attorney General's involvement of the state in other types of litigation on his own initiative.

**19.** The black letter in 7 C.J.S. Attorney General § 8a is:

> The attorney general, as the chief legal representative of the state, may institute all legal proceedings necessary to protect the interests of the state . . ..

*Accord,* 7 Am.Jur.2d § 11, Attorney General. *See, e. g., State ex rel. Carmichael v. Jones,* 252 Ala. 479, 41 So.2d 280 (1949); *Morley v. Berg,* 216 Ark. 562, 226 S.W.2d 559 (1950); *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 112 Cal.Rptr. 786, 520 P.2d 10 (1974); *Gandy v. Reserve Life Ins. Co.,* 279 So.2d 648 (Miss.1973); *Bonniwell v. Flanders,* 62 N.W.2d 25 (N.D.1953); *Agey v. American Liberty Pipe Line Co.,* 141 Tex. 379, 172 S.W.2d 972 (1943).

**20.** This was made clear in *Kress* by the Florida Supreme Court's inclusion of the quo warranto power of the attorney general in the list of the powers of the office quoted in text:

> The Attorney General has the power . . by writ of quo warranto to determine the right of any one who claims or usurps any office, and to vacate the charter or annul the existence of a corporation for violation of its charter or for omitting to exercise its corporate powers; to enforce trusts and prevent public nuisances and the abuse of trust powers. As the chief law officer of the state, it is his duty in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interest may require from time to time.

155 So. at 827. The conclusion that *only* quo warranto proceedings are within the attorney general's power to initiate is negated both by the inclusion of that type of proceeding in the list without apparent distinction and by the sweeping power acknowledged in the last sentence of the quoted passage.

**21.** We note that the United States District Court for the Southern District of Florida has held that, "under Florida law, the Attorney General has the authority to institute suit to enforce rights created under the laws of Florida in the Federal Court in Diversity suits, but not to enforce rights created under the laws of

start with the Florida Supreme Court's *Kress* decision: "The Attorney General has the power . . . to prosecute *all actions* necessary for the protection and defenses of the property and revenue of the state" (emphasis added). We note also that such a limitation would result in a significant impairment of the state's ability to expeditiously assert important rights under the antitrust laws, bankruptcy laws, and other federal legislation; if authorization must be forthcoming from the legislature or from a myriad of state agencies, it will in some cases come too late to be worthwhile. Moreover, study of applicable Florida statutes reveals no basis for such a restriction. To the contrary, the Attorney General is authorized to "appear in and attend to" litigation in state and federal courts alike. § 16.01, Fla.Stat.Ann. (1961). Finally, we note that actions by attorneys general on behalf of states under the federal antitrust laws are by no means a novel phenomenon. *See, e. g., Hawaii v. Standard Oil of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *In re Multidistrict Motor Vehicle Air Pollution Control Equipment,* 481 F.2d 122 (9 Cir.), *cert. denied sub nom., Morgan v. Automobile Mfr's Assn.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *State of Illinois v. Bristol-Myers Co.,* 152 U.S.App.D.C. 367, 470 F.2d 1276 (1972); *State of West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079 (2 Cir.), *cert. denied sub nom., Cotler Drugs, Inc. v. Chas. Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *State of Illinois v. Associated Milk Producers, Inc.,* 351 F.Supp. 436 (N.D.Ill.1972); *State ex rel. Derryberry v. Kerr-McGee Corp.,* 516 P.2d 813 (Okl.1973). *See also Gardner v. State of New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947) (attorney general's response to objections in railroad reorganization proceeding under

the United States." *Point East One Condominium Corp. v. Point East Developers, Inc.* (No. 73–1815—Civ.–CA, Oct. 17, 1974).

**22.** Such an argument would draw a distinction between actions by the state to vindicate its interests as a unified government entity—for

Bankruptcy Act was authorized by state law); *Commonwealth of Kentucky ex rel. Hancock v. Ruckelshaus,* 362 F.Supp. 360 (W.D.Ky.1973) (action by attorney general under Clean Air Act of 1970). For all these reasons, we find no basis for holding that the Attorney General may not act to enforce a state's rights under federal as well as state law.

Finally, it could be argued that, although the common law power of the attorney general to initiate actions under federal law exists, there is no power to initiate an action without affirmative authorization from state instrumentalities where, as here, the action seeks to recover damages allegedly accruing to those instrumentalities.[22] Pertinent to this point are the Florida Supreme Court decisions in *Holland v. Watson,* 153 Fla. 178, 14 So.2d 200 (1943), and *Watson v. Caldwell,* 158 Fla. 1, 27 So.2d 524 (1946). In those cases, the Court held that the statutorily-created Board of Administration and Trustees of the Internal Improvement Fund were not required to allow the Attorney General to represent them in legal matters, but could employ special counsel of their own choosing.

We find that *Holland* and *Watson* do not cast doubt on the Attorney General's power in this case for several reasons. First, those cases were not ones in which the Attorney General's litigation power was at issue. In both cases, the Florida Supreme Court categorized the Attorney General's duties under three headings:

(1) Such duties as the Constitution and the Legislature lay on him, (2) His duties as legal advisor to the officers of the Executive Department, and (3) His duty as to litigation in which the State is a party or is otherwise interested. 14 So.2d at 202; 27 So.2d at 528.

example, proceedings to abate a nuisance or in the nature of quo warranto—and those by the state as a consumer, in which the state may be seen as a collective of the various departments, agencies, and subdivisions which are the actual consumers.

The Court then treated the question before it as falling under (2)—whether the phrase "officers of the Executive Department" extended to the governmental bodies in question. The scope of the Attorney General's litigation power, under (3) above, was not discussed at all.

Second, the cases in question dealt with a situation in which there was a conflict between the wishes of the Attorney General and the government body as to the body's legal representation. The body had secured legal counsel on its own and the Attorney General sued to enjoin that action. By contrast, there is no evidence in the record before us of any objection on the part of the government bodies which allegedly have been injured by the defendants' business practices. And, as a practical matter, it is difficult to imagine such objections. The individual government instrumentalities involved have something to gain from this suit, and nothing to lose but their causes of action (by way of res judicata or collateral estoppel); and in view of the novelty and difficulty of this suit, it seems most unlikely that those government entities would prefer to prosecute their causes of action individually.

Finally, and most importantly, *Holland* and *Watson* can be read, at the very most, to negate the Attorney General's independent litigation powers only with respect to those governmental entities which are not part of the "Executive Department" of Florida. Thus, even if this extreme and, we believe, incorrect reading of those decisions were adopted, the Attorney General's powers with respect to the basic Executive Department would remain unquestioned. At this stage of the case, the sole question for decision is whether the Attorney General of Florida is properly in federal court prosecuting this action; it is, in essence, a question of standing. We find that, at least as to the Attorney General's right to represent the state on behalf of the basic Executive Departments, there can be no significant doubt.[23]

■■ For all of these reasons, we believe that the *Holland* and *Watson* cases do not negate the Attorney General's authority to bring the instant action.[24] Neither do we believe that the Attorney General's authority is seriously cast in doubt by the Florida statutes cited by defendants. The fact that various statutes delegate specific portions of Florida's litigation power to state's attorneys[25] in no way indicates an abrogation of the Attorney General's common law powers as to *other* types of litigation; those powers still obtain in the absence of express legislative provision to the contrary. *See, e. g., State ex rel. Patterson v. Warren,* 254 Miss. 293, 180 So.2d 293, 299–300 (1965); 7 Am. Jur.2d § 10, Attorney General; 7 C.J.S.

**23.** Therefore we leave any subsidiary questions as to the representation of the state on behalf of other governmental entities to the stage of this action (and we make no assumption that it will be reached) at which those questions will become relevant: the calculation of damages. In doing so, we are in no way evading an issue properly before us; the question of standing is resolved. And our action is not contrary to the policy against piecemeal litigation. There is a possibility that this litigation, by settlement or otherwise, will not reach the damages stage. And in any event we believe that the computation of damages is likely to be a minor part of the lawsuit as compared to the establishment of a substantive cause of action.

**24.** In reaching our conclusion on this point, we see no need for heavy reliance on the decision in *State ex rel. Shevin v. Yarborough,* 257 So.2d 891 (Fla.1972). The Florida Supreme Court stated in its opinion that "[w]e, therefore, conclude that the Attorney General does have status to represent the State as a consumer", apparently without authorization of the subordinate entities who are the direct consumers. But defendants are correct in noting that the Attorney General's status in that regard was not at issue in the case.

**25.** *E. g.,* Fla.Stat.Ann. § 27.02 (1961) (original criminal proceedings; Fla.Stat.Ann. §§ 17.20, 27.10 (1961) (collection of state claims; Fla. Stat.Ann. §§ 544.03, 544.06 (1961) (criminal and injunctive action against combinations tending to obstruct sale of beef).

Attorney General § 5. And the Florida Legislature's authorization of suit by the Attorney General under the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat.Ann. § 501.201 *et seq.* (1974 Supp.), does not negate his powers with relation to the federal antitrust laws. That statute assigns part of its enforcement power to the state's attorneys, thus necessitating specific delineation of the respective responsibilities of the state's attorneys and Attorney General. The specific authorization therefore had an independent purpose and permits no negative implication as to the federal acts; in any event, the statutory grant of a power possessed by the attorney general at common law normally does not deprive him of other common law powers. *See State ex rel. Carmichael v. Jones,* 252 Ala. 479, 41 So.2d 280, 284 (Ala. 1949); 7 C.J.S. Attorney General § 5. Finally, defendants cite the 1969 creation of a Department of Legal Affairs, headed by the Attorney General, to serve as counsel where requested by state governmental bodies, which have independent rights to sue on their own behalf. Fla.Stat.Ann. § 20.11 (1974 Supp.). But that statute merely transfers the Attorney General's powers, including all those "prescribed by law," and provides that each board "of which the attorney general is a member" may retain other counsel. Thus, to the extent the statute is at all relevant, it casts no more doubt on the Attorney General's powers than *Holland* and *Watson.* Like those cases, the statute deals with a board's rights to obtain other counsel *if it so chooses* and, like those cases, the statute applies to only a few of the entities upon whom the Attorney General's standing in this case may be based.

III.

Thus we conclude that (1) the Attorney General of Florida retains common law powers, (2) that those powers extend to institution of suits under federal law without specific authorization of the individual government entities who allegedly have sustained the legal injuries asserted, and (3) that neither the decisional nor statutory law of Florida negates such authority.

We reach this conclusion, after extensive study and able briefing by all parties, with considerable confidence. In our view, this simply is not an extremely close question.

But whatever our confidence, only the Florida Supreme Court can decide this state law question in a manner that is, by definition, correct. Thus the defendants' strong urging that the issue be certified to that Court [26] has considerable force. Both the United States Supreme Court [27] and this Court [28] have lauded the certification process, not only because it produces definitive answers but also because it "helps build a cooperative judicial federalism". *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974). However, as has been noted by Chief Judge Brown, one of the strongest advocates of the process, certification should never be automatic or unthinking. "We use much judgment, restraint and discretion in certifying. We do not abdicate." *Barnes v. Atlantic & P. Life Ins. Co.,* 514 F.2d 704, 705 n. 4 (5 Cir. 1975).

■ In determining whether to exercise our discretion in favor of certification, we consider many factors. The most important are the closeness of the

---

**26.** Under Florida law, the United States Supreme Court or any United States Court of Appeals may certify questions of state law to the Florida Supreme Court where such questions "are determinative of the said cause, and there are no clear controlling precedents in the decisions of the supreme court of this state." Fla.Stat.Ann. § 25.031 (1961). The question is then briefed to the Florida Supreme Court and

oral argument may be allowed. Rule 4.61, Fla. R.App.Proc.

**27.** *Lehman Bros. v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974).

**28.** E. g., *Coastal Petroleum v. Secretary of Army,* 489 F.2d 777 (5 Cir. 1973); *Hopkins v. Lockheed Aircraft Corp.,* 394 F.2d 656 (5 Cir. 1968).

question and the existence of sufficient sources of state law—statutes, judicial decisions, attorney general's opinions—to allow a principled rather than conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant in light of the particular issue and case to be decided.[29] And we must also take into account practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.[30]

As we have noted earlier, the narrow issue of the Florida Attorney General's standing to bring this action does not seem to us an extremely close one. And we come to this conclusion with the aid of a long line of Florida decisions—from *Gleason* to *Kress* to *Yarborough*—as well as the body of common law dealing with the powers of attorneys general. This clearly is not a case in which we are required to "guess" state law from one or two questionable precedents.

Defendants urge that the issue before us is one which concerns "the fundamental political structure of the State of Florida" and thus involves a "sensitive area of state law." Although we might respond that the absence of intervention by other state instrumentalities casts doubt upon the degree to which this case involves actual internal state conflict, we recognize that this point has some validity. Comity considerations are more applicable in this case than in one involving, for example, the interpretation of a clause in an insurance contract. However, it is not entirely clear which way the policy in favor of respect for state governmental processes cuts in this case. We have before us the Attorney General, elected by the people of Florida, whose opinions on questions involving the duties of various state officials are per-

suasive, though certainly not binding, in Florida courts. Fla.Stat.Ann. § 16.01 (1961); *see Beverly v. Division of Beverage of Dept. of Bus. Regulation*, 282 So.2d 657 (Fla.D.Ct.App.1973). He has brought this action in what he has determined to be the public interest and has proceeded for two years without apparent opposition from the Florida Legislature or the state governmental entities he purports to represent. To impede the progress of this action through the certification process itself seems to us to involve some disregard of the state governmental processes that comity principles require us to respect.

Moreover, we note that, unlike most certification cases, this is not an *Erie* diversity case in which the federal courts merely provide an impartial forum. It is a pure federal question case in which state law happens to be relevant in determining the issue of standing. Additionally, this is not a suit which could ever have been brought in state court, since the federal courts have exclusive jurisdiction over Sherman and Clayton Act cases. 15 U.S.C. §§ 15, 26 (1970). The fact that this is primarily a federal case, and one which has not been "lured" into federal court by means of the diversity jurisdiction, renders considerations of federal-state comity somewhat less persuasive still.

Finally, we must consider an inevitable side effect of certification—delay. The experience in our Circuit has been that the process requires a period approaching one year at the least—sometimes much more. *See, e. g., Allen v. Estate of Carman*, 446 F.2d 1276 (5 Cir. 1971), *on receipt of answers to certification*, 486 F.2d 490 (5 Cir. 1973) (28 months); *Hopkins v. Lockheed Aircraft Corp.*, 358 F.2d 347 (5 Cir. 1966), *on receipt of answers to certification*, 394 F.2d 656 (5 Cir. 1968) (26 months). We consider the prospect of such delay par-

---

**29.** One aspect of this is the likelihood of the recurrence of the particular legal issue. *See Barnes v. Atlantic & P. Life Ins. Co.*, 514 F.2d 704, 706 (5 Cir. 1975).

**30.** *See* C. Wright, *Law of Federal Courts* 203–05 (2d ed. 1970).

ticularly significant in the context of this case. Over two and one-half years already have passed since the filing of this complaint and many preliminary questions are yet to be resolved. The discovery which must take place to establish the alleged violations, if there be any, can only be massive and extremely time-consuming. As a result, we believe that delay that is not absolutely necessary should be avoided. It is quite possible that the charges against the defendants are wholly ill-founded; but if they deserve to prevail, defendants should do so on the merits rather than through the passage of time.

For all these reasons we decline to certify the state law question in this case to the Florida Supreme Court. In taking this action, we intend to cast no doubt on the general efficacy of the certification process. And we certainly recognize the supremacy of the Florida Supreme Court as interpreter of state law, as well as the possibility, though we believe it to be small, that our decision today is an erroneous one.

Absolute certainty in judicial decisions, as in other areas of human action, is a rare and expensive commodity. In certification cases, unlike most which come before us, it is available to us, since the Florida Supreme Court's word is final. But in this case, with the law on this issue fairly clear, we find the price of certainty too high, in terms of delay which may prejudice the plaintiffs' rights to a speedy resolution of the merits.

Therefore the judgment is reversed.

COLEMAN, Circuit Judge (dissenting):

I respectfully dissent. I would certify this question to the Supreme Court of Florida. Under my concept of federalism, that Tribunal should be the one to delineate the authority, power, and duties of its Attorney General in those situations where that authority has been drawn into question, especially where, as here, the authority is not express and, at the best, can only be supplied by implication.

Even though a state Attorney General is exercising common law authority as the chief law officer of the realm, he does not exercise that authority as an unlimited monarch, governed only by his own judgment. He necessarily remains, and can act only, as the duly authorized agent (servant) of the State from whence he derives his authority, as formerly from the King.

"The power and duties of the English attorney general, though frequently referred to as common-law powers and duties, were not in fact such. He was the King's legal adviser and represented him in the courts, and was when the common law came to this country appointed not under any common-law rule but by letters-patent of the King, which set forth what his powers and duties should be, including the courts in which he could appear as the King's representative, and he was at all times subject to the King's supervision and control. 6 Holdsworth's History of the Common Law, 458 et seq. It is true that the common law recognized his right to represent the King in the courts to the extent authorized by his letters-patent, but did not confer or broaden this right." [1]

As the majority opinion points out, the 1968 Florida Constitution directs that the Attorney General "shall exercise such powers and perform such duties as may be *prescribed* by law" (emphasis mine). There is much room for doubt that by implication the Attorney General has authority "prescribed by law" to bring this particular suit, freighted as it is with much expense and potentially heavy court costs.

In any event, first and last, this is solely a question of Florida law, dealing with one of its officials who purports to

1. Chief Justice Smith, dissenting in *Kennington-Saenger Theaters v. State,* 196 Miss. 841, 18 So.2d 483, 153 A.L.R. 883 (1944).

act on its behalf. While we have jurisdiction to decide it incidentally to the pending suit, I would give the Florida courts a chance to resolve it in a final, binding manner, especially since we need not invoke the doctrine of abstention but may resort to a specific procedure, frequently invoked in questions of less far reaching consequences.