State of TEXAS, Plaintiff,

v.

YSLETA DEL SUR PUEBLO, Tigua Gaming Agency, the Tribal Council, Tribal Acting Governor Filbert Candeleria, and Gaming Commissioner Francisco Hernandez, Defendants.

No. EP–99–CA–320–H.

United States District Court,
W.D. Texas,
El Paso Division.

Dec. 3, 1999.

---

John Cornyn, Atty. General, State of Texas, for Plaintiff.

Tom Diamond, Diamond Rash Gordon & Jackson, P.C., El Paso, TX, for Defendants.

### ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

HUDSPETH, District Judge.

This is the case that asks the question: can the State of Texas enjoin gambling activities taking place on an Indian reservation located within its borders?[1] On September 27, 1999, the Attorney General of the State of Texas ("AG") commenced this action to enjoin Defendants from operating a gaming facility called "Speaking Rock Casino," located on the Ysleta del Sur Pueblo Tribe ("Tribe") reservation. In response, the Defendants, a group which includes the Tribe itself along with two tribal officials and the Tribal Council, filed a motion to dismiss pursuant to Federal Rules of Civil Procedure ("F.R.C.P.")

12(b)(1), 12(b)(6), and 12(b)(7). On November 12, 1999, Plaintiff responded. This case is now ripe for decision.

#### A. Background

The members of the Tribe are descendants of Indians who fled from New Mexico in the Pueblo Revolt of 1680. See W.H. TIMMONS, EL PASO: A BORDERLANDS HISTORY 17–24 (1990). After following the defeated Spaniards south, the Indian refugees, composed of members of several tribes, settled near what is now San Elizario, Texas, and formed what came to be known as the Ysleta del Sur Pueblo. See id. Throughout the eighteenth and nineteenth centuries, the Tribe retained a kinship-based tribal government. See id. at 181. In 1895, the Tribe adopted a constitution and by-laws to protect its traditions and culture from "Mexicanization." See id. In 1967, the State of Texas recognized the Tribe, and established the present reservation. See id. at 260. The following year, the federal government also recognized the Tribe, but delegated all its administrative responsibilities to the State of Texas. See Ysleta del Sur Pueblo v. State of Texas, 36 F.3d 1325, 1327 (5th Cir.1994) ("Ysleta I").

In the mid–1980s, amidst concerns regarding the constitutionality of the arrangement, Congress established a new federal trust with the Tribe. See Ysleta I, 36 F.3d at 1327–28; Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, 25 U.S.C. § 1300g et seq. (1987) ("Restoration Act"). The Restoration Act purported to prohibit gambling on the reservation by incorporating state law; however, the Tribe tried to compel Texas to negotiate a "Tribal–State compact" pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq. (1987). See Ysleta De Sur Pueblo v. State of Texas, 852 F.Supp. 587, 588–89 (W.D.Tex.1993). The Tribe hoped that an IGRA compact would result in federal authorization of reservation gambling. The Fifth Circuit Court of

---

**1.** Certain forms of gambling are prohibited in Texas. See TEX. PEN. CODE ANN. § 47.01 et

seq.; see also TEX. CONST. ART. 3 § 47(a) (di-

Appeals ultimately resolved the question in favor of the State of Texas by holding that the Restoration Act, as opposed to IGRA, would govern the gambling question were a proper suit to arise. See Ysleta I, 36 F.3d at 1335–36.

Despite the implications of the Fifth Circuit's holding, the Speaking Rock Casino began operating in 1993. In 1998, however, the Tribe commenced a suit against the State of Texas for declaratory and injunctive relief to validate reservation gambling after the Governor of Texas opined that the Tribe was violating the Restoration Act. See Ysleta del Sur Pueblo v. Bush, No. P–98–CA–47, (W.D.Tex.Aug.7, 1998) ("Ysleta II"). The district court found that Texas had not waived its Eleventh Amendment immunity, and dismissed the case. See id. The Fifth Circuit affirmed, and the Tribe is now petitioning for a writ of certiorari from the United States Supreme Court. (Def. Mot. to Abate.)

Having also determined that activities at Speaking Rock were in violation of the Restoration Act, the AG commenced the instant lawsuit. In their motion to dismiss, Defendants raise the following claims: (1) Congress never waived the Tribe's sovereign immunity, (2) the United States must be joined as an indispensable party before the AG can proceed, and (3) the AG lacks capacity to sue the Tribe on behalf of the State of Texas.

### B. Waiver of Sovereign Immunity

Defendants first argue that nothing in the Restoration Act constitutes a waiver of the Tribe's sovereign immunity. Alternatively, Defendants argue that the question of whether Plaintiff can bring suit should be governed by Public Law 280.[2] The

Supreme Court has determined that Public Law 280 does not constitute a waiver of tribal sovereign immunity. See Three Affiliated Tribes of Fort Berthold Reserv. v. Wold Eng'g, 476 U.S. 877, 892, 106 S.Ct. 2305, 2314, 90 L.Ed.2d 881 (1986). Consequently, Defendants maintain, under either theory the Tribe is immune from suit, and the action should be dismissed.

■ Indian tribes enjoy common-law immunity from suit traditionally enjoyed by sovereign powers. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Although tribes have the power to regulate internal matters, make their own substantive laws, and enforce laws in their own forums, Congress can "limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." See id. at 55–57, 98 S.Ct. at 1676–77 (citing Talton v. Mayes, 163 U.S. 376, 384, 16 S.Ct. 986, 989, 41 L.Ed. 196 (1896)). Consequently, Congress may waive tribal immunity, provided that the waiver is "unequivocally expressed." See id. at 58–59, 98 S.Ct. at 1677.

■ The Restoration Act provides that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." See 25 U.S.C. § 1300g–6(a). All civil and criminal penalties relating to illegal gambling under state law apply on the reservation, and Congress granted exclusive jurisdiction to federal courts over actions involving gaming violations on the reservation. See 25 U.S.C. § 1300g–6(a–c). Most importantly, the Restoration Act allows the State of Texas to bring suit in federal court to enjoin any such violations. See id.[3]

recting state legislature to pass anti-gaming laws).

**2.** Public Law 280 is codified at 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a). See Pub.L. No. 83–280, §§ 2, 4, 67 Stat. 588, 588–89 (1953). Under Defendants' theory, some of the language of Public Law 280 mirrors provisions of the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1301 et seq. (1968), even though the former statute applies only to

certain tribes outside of Texas. Compare 28 U.S.C. § 1360 and 18 U.S.C. § 1162 with 25 U.S.C. §§ 1321–22. By contrast, ICRA applies to all federally-recognized tribes. See 25 U.S.C. § 1301. Hence, Defendants argue, Public Law 280 jurisprudence should apply to tribes in Texas through ICRA.

**3.** The statute reads as follows: "[N]othing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin viola-

■ The Court finds that § 1300g–6 does represent an unequivocal waiver of tribal immunity, and governs the sovereign immunity issue in this case. This holding is reached even though tribal immunity waivers are to be strictly construed, with all ambiguous provisions interpreted in favor of the tribe. See *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985); *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753 (1985). In addition, the Court finds that Defendants' argument regarding Public Law 280 and the ICRA fails since Congress clearly intended to abrogate the Tribe's immunity for purposes of prohibiting gambling. The Restoration Act is an act related to specific tribes, and was passed almost twenty years after ICRA. See *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) ("[Absent clear intent by Congress], a specific statute will not be controlled or nullified by a general one.") In addition, Public Law 280 does not apply to Texas tribes. More importantly, the Fifth Circuit Court of Appeals has made it clear that the analysis of gambling on the Tribe's reservation is to be governed exclusively by the Restoration Act. See *Ysleta I*, 36 F.3d 1325, 1332–35 (5th Cir.1994) ("the Restoration Act ... and not IGRA would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law.") Moreover, the Fifth Circuit implicitly repudiated Public Law 280 jurisprudence in *Ysleta I*.[4] Furthermore, tribal immunity is not a defense to a claim for injunctive relief when brought against tribal officials and the Tribe itself. See *TTEA v. Ysleta*

*Del Sur Pueblo*, 181 F.3d 676, 680–681 (5th Cir.1999);[5] see also *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. at 1677. Thus, Plaintiff has established a prima facie basis to proceed.

### C. Indispensable Party

■ Defendants' next argument is that the case should be dismissed, pursuant to F.R.C.P. 12(b)(7), unless the United States is joined as an indispensable party. Defendants claim that the United States may eventually bring its own action against the Tribe concerning the same gaming activities, even if Defendants prevail in this case; thus, the potential exists for "inconsistent obligations." (Def. Mot. at 9.) See F.R.C.P. 19(a)(ii). The cases cited by Defendants for the proposition that the United States must be joined in every suit involving a federally-recognized tribe are inapposite. The United States was never joined in *California v. Cabazon Band of Mission Indians*, nor did the Supreme Court express any opinion on joinder in that case. See 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Carlson v. Tulalip Tribes of Washington*, the Tenth Circuit Court of Appeals held that the United States was an indispensable party only because that case involved a boundary dispute on lands to which the United States possessed fee title. See 510 F.2d 1337 (10th Cir.1975). In this case, federal law incorporates state law for purposes of gambling violations. See *Ysleta I*, 36 F.3d at 1335. Thus, legally there should be no inconsistent obligations, since the causes of action are the same. Furthermore, the threat of multiple litigation does not, by itself, necessitate joinder. See *Boone v. General Motors Acceptance Corp.*, 682 F.2d 552, 554 (5th Cir.1982);

tions of the provisions of this section." See 25 U.S.C. § 1300g–6(c) (emphasis added).

**4.** The lower court determined that IGRA directed courts to adopt the analytical framework of the Supreme Court's ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) in assessing reservation gambling questions. See *Ysleta De Sur Pueblo*, 852

F.Supp. at 593. *Cabazon* was a Public Law 280 case. Thus, by finding that the Restoration Act, and not IGRA, governed a dispute involving the Tribe, it implicitly rejected the "*Cabazon*/Public Law 280" framework. See *Ysleta I*, 36 F.3d at 1335.

**5.** The suit in *TTEA* was brought against the Tribe, two tribal judges, and the Tribal Court.

*Delgado v. Plaza Las Americas, Inc.,* 139 F.3d 1, 3 (1st Cir.1998). Accordingly, Defendant's Rule 12(b)(7) claim should be denied.

## D. Capacity to Sue

Defendants' last contention is that the Attorney General lacks the capacity to sue on behalf of the State of Texas.[6] Defendants have met the requirement of F.R.C.P. 9(a) by raising the issue of capacity through "specific negative averment." See F.R.C.P. 9(a); 6A CHARLES A. WRIGHT & ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 1559 (2nd ed. 1990) ("FED PRAC. & PROC."). In addressing a "capacity" claim, a Rule 12(b)(6) motion is favored, given that a court cannot grant relief to a party lacking capacity to sue. See Klebanow v. N.Y. Produce Exch., 344 F.2d 294, 296 (2nd Cir.1965); 5 FED. PRAC. & PROC. § 1294. Moreover, having determined that a tribal immunity defense is unavailable, and given that a capacity claim is generally non-jurisdictional, a 12(b)(1) motion is inappropriate. See TTEA, 181 F.3d at 680–81; Brown v. Keller, 274 F.2d 779, 780 (6th Cir.1960), cert. denied, 363 U.S. 828, 80 S.Ct. 1599, 4 L.Ed.2d 1523 (1960) (characterizing capacity claim as non-jurisdictional); Summers v. Interstate Tractor and Equip. Co., 466 F.2d 42, 50 (9th Cir.1972) (same). Consequently, the Court addresses Defendants' capacity claim only as a 12(b)(6) motion.

■ In analyzing a capacity claim, a federal court must defer to the law of the state in which it sits. See F.R.C.P. 17(b). State law includes constitutions and statutes, as well as judicial decisions construing them. See 6A FED. PRAC. & PROC. § 1559; *Klebanow,* 344 F.2d at 297. Thus, the question whether a state attorney general has capacity to sue in a particular case is governed by state law. See *State of Fla. ex. rel. Shevin v. Exxon Corp.,* 526

F.2d 266, 269 (5th Cir.1976); *Philadelphia Hous. Auth. v. American Radiator & Standard Sanitary Corp.,* 309 F.Supp. 1057, 1058 (E.D.Pa.1969). Although at common law the office of attorney general was endowed with broad powers to act in the public interest, assessment of a state attorney general's power is a state-specific inquiry. See *Shevin,* 526 F.2d at 268–69. Thus, the Court must answer the question through reference to the "whole law" of the State of Texas. See *Klebanow,* 344 F.2d at 297; cf. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Unlike states such as Maryland, Pennsylvania, and Delaware, no constitutional or statutory provision in Texas grants the AG broad general powers to sue on behalf of the state whenever he or she believes that litigation would be in the public interest. See *Commonwealth of Pa. v. Mid–Atlantic Toyota Distrib.,* 704 F.2d 125, 129 n. 7 (4th Cir.1983) (comparing attorneys general in aforementioned states with those in states such as Oklahoma where the office's broad common law authority was eliminated). The general duties of the AG are defined in one provision in the state constitution. See TEX. CONST. ART. Iv § 21. The AG's powers are further defined in the Texas Government Code. See TEX. GOV'T CODE ANN. § 402.001 et seq. Although the AG has the power to "prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals," any admission, agreement, or waiver made by the AG "in a suit to which the state is a party does not prejudice the rights of the state." See *id.* §§ 401.021, 401.004.

More importantly, Texas courts have consistently held that the Texas AG is powerless to act in the absence of explicit statutory or constitutional authorization.[7]

---

6. "Lack of capacity" (i.e. a party's right to initiate a suit on behalf of another) should not be confused with "standing" insofar as standing refers to whether a party has a "personal stake in the outcome." See generally *Board of Educ. v. Illinois State Bd. of Educ.,* 810 F.2d 707, 709–10 n. 3 (7th Cir.1987).

7. See *Day Land & Cattle Co. v. State,* 68 Tex. 526, 4 S.W. 865 (Tex.1887) (holding that in the absence of an express law, it would not imply authority from the AG's "general grants of power or imposition of duties ... [because] in a government in which the duties of all officers, as well as their powers, are defined

Those courts have repeatedly permitted the AG to sue provided that specific authorization could be found in a relevant act.[8] Similarly, they have dismissed actions in which the AG attempted to rely upon implied powers without express authority from the legislature.[9] To the extent that the courts have occasionally broadened the types of actions the AG may bring, or even implied a power to sue, the analysis stemmed from specific statutory provisions, rather than an implied general common law power.[10] Perhaps most importantly, the state legislature has consistently included provisions in its statutes authorizing the AG to sue on the state's behalf whenever it determines that his or her skills are needed.[11] Thus, the "whole law" of Texas indicates that the AG must be given specific authorization in order to bring suit. Cf. *Charles Scribner's Sons*, 114 Tex. at 28, 262 S.W. at 728

("Fixedness of responsibility is a necessity in government.")

■ In this case, the AG has cited no statute empowering him to sue the Defendants on behalf of the State of Texas, nor is any grant of authority found in the Texas Penal Code.[12] The AG's claim of authorization through his common law power must be rejected in light of the preceding discussion. Although the AG attempts to characterize § 1300g–6(c) of the Restoration Act as providing him with authority to sue, such a reading would in effect transform Congress into the Texas legislature. See *Mid–Atlantic Toyota*, 704 F.2d at 129 (recognizing that Congress could not redefine powers of state attorney generals); cf. *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that Congress cannot force state executive officials to enact or administer federal programs). The statute

---

by written law, no power ought to be exercised for which warrant is not there found.)"; *Brady v. Brooks*, 99 Tex. 366, 89 S.W. 1052 (1905) (explaining that the framers of the state's constitution had intended to allow "the Legislature to impose upon the Attorney General duties in addition to those expressly defined [in the state constitution] to enable that body to provide that that officer should represent the state in any class of cases where his services should be deemed requisite.")

**8.** See *Charles Scribner's Sons v. Marrs*, 114 Tex. 11, 27, 262 S.W. 722, 728 (Tex.1924); *Smith v. State*, 160 Tex. 256, 328 S.W.2d 294, 294–95 (1959) (per curiam); *Baker v. Wade*, 743 F.2d 236, 242 (5th Cir.1984); *State ex rel. Cavanaugh v. Nelson*, 170 S.W. 814, 815 (Tex. Civ.App.—Amarillo, 1914, no writ).

**9.** See *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 56 (Tex.Civ.App.—San Antonio, 1942, writ ref'd w.o.m.) (determining that since the AG's powers could not be enlarged or restricted except in manner authorized by state constitution, AG lacked power to bring action to remove state officials); *Garcia v. Laughlin*, 155 Tex. 261, 285 S.W.2d 191, 194 (1955) (affirming *Harney*); *State v. Reagan County Purchasing Co.*, 186 S.W.2d 128, 135 (Tex.Civ.App.—El Paso, 1944, writ ref'd w.o.m.) (finding that AG could not determine terms on which public domain could be sold since "acts beyond the scope of his delegated power are not binding on the state"); *Hill v.*

*Tex. Water Quality Bd.*, 568 S.W.2d 738, 740–41 (Tex.Civ.App.—Austin, 1978, writ ref'd n.r.e.) (rejecting AG's "implied common law powers" argument).

**10.** See, e.g., *State of Texas v. Scott & Fetzer Co.*, 709 F.2d 1024, 1026 (5th Cir.1983) (determining that state statute allowing AG to recover damages for violation of federal antitrust law permitted him to bring *parens patrie* action); *Agey v. American Liberty Pipe Line Co.*, 141 Tex. 379, 172 S.W.2d 972, 974 (1943) (finding clearly implied authorization for AG to enforce civil penalty provision in specific act). Furthermore, to the extent that *Terrazas v. Ramirez* may or may not represent a departure from the general rule, that badly-fractured opinion represents only a small bump on an otherwise smooth jurisprudential plane. See *Terrazas v. Ramirez*, 829 S.W.2d 712 (Tex. 1991).

**11.** See generally 7 Tex. Jur. 3D § 13 (1980) (listing AG's litigation duties as specified in diverse statutes); *State v. Thomas*, 766 S.W.2d 217, 220 (Tex.1989) (same).

**12.** See Tex. Pen. Code Ann. § 47.01 et seq.; see also *Lone Starr Multi Theatres, Inc. v. State*, 922 S.W.2d 295, 298 (Tex.App.—Austin, 1996, no writ) (noting that authority to enforce Penal Code is vested exclusively in district and county attorneys, and that AG cannot initiate prosecutions.)

should instead be construed to give the State of Texas the option to enforce its anti-gaming laws in federal court, in accordance with state law. See *Edward J. De-Bartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) (directing courts to construe statutes to avoid constitutional problems). The burden of proof rests with the AG to identify a source of power authorizing him to exercise this option on behalf of the state. See *Day Land & Cattle,* 68 Tex. at 533–34, 4 S.W. at 867. Thus far, the AG has not met his burden.

Nonetheless, given the competing policy interests in this case, and in light of the fact that dismissal is generally disfavored under the Federal Rules, the Court will afford the AG an opportunity to amend his complaint to properly demonstrate his source of authority, under Texas law, to bring this suit.[13]

It is therefore ORDERED that the Attorney General of the State of Texas file an amended complaint within ten (10) days of the date of this order, specifying the source of his authority under Texas law to enjoin gambling operations. If the Attorney General fails to amend the complaint accordingly within the time specified, Defendants' motion to dismiss under F.R.C.P. 12(b)(6) for lack of capacity will be granted.

It is further ORDERED that in all other respects Defendants' motion to dismiss in the above-styled and numbered cause be, and it is hereby, DENIED.

---

**13.** Arguably, the AG could characterize Speaking Rock as a "common nuisance" since it appears to be "a place to which persons habitually go for the purpose of ... gambling in violation of the Texas Penal Code." See TEX. CIV. PRAC. & REM. CODE § 125.001. The AG has authority to bring suit to abate or enjoin such a nuisance. See *id.* § 125.002. On their face, these statutes appear to confer the necessary authority.